Filed 11/8/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHELLE K., an Incompetent Person, etc.<br><br>    Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>    Respondent;<br><br>HARBOR DEVELOPMENTAL DISABILITIES FOUNDATION et al.,<br><br>    Real Parties in Interest. | G048018<br><br>(Super. Ct. Nos. A169658 & 30-2012-00608957)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Caryl Lee, Judge. Petition granted in part and denied in part; writ issued.

Locke Lord, Jon L. Rewinski and Matthew B. Nazareth for Petitioner.

No appearance for Respondent.

Frank Ospino, Public Defender, Mark S. Brown, Assistant Public Defender, and Kira Rubin, Deputy Public Defender, for Real Party in Interest Orange County Public Defender's Office.

Enright & Ocheltree, Judith A. Enright and Julie A. Ocheltree for Real Party in Interest Harbor Developmental Disabilities Foundation, doing business as Harbor Regional Center.

\*                \*                \*

Petitioner Michelle K., an incompetent person, by George K.,[1] her conservator, seeks writ relief to prevent the trial court from conducting an evidentiary hearing on (1) a habeas corpus petition the Orange County Public Defender (Public Defender) filed on Michelle's behalf to obtain her release from Fairview Developmental Center (Fairview), and (2) a periodic judicial review on whether Michelle's Fairview placement remains necessary. Michelle is a 51-year-old, developmentally disabled adult who has resided at Fairview for more than 40 years due to a series of placements made under the Lanterman Developmental Disabilities Services Act (Lanterman Act; Welf. & Inst. Code, § 4500 et seq.).[2] The Public Defender brought the habeas corpus petition under section 4800 because it contends less restrictive facilities can provide similar care for Michelle and the Lanterman Act mandates placement of developmentally disabled persons in the least restrictive environment capable of meeting their needs. George contends the Public Defender lacks authority to pursue the habeas corpus petition because he, as Michelle's legal representative, has determined Fairview is the best placement for Michelle.

---

[1] We abbreviate the last name of Michelle and her family members, and will use only their first names, to protect Michelle's privacy. (See Welf. & Inst. Code, § 4502, subd. (b); *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008, fn. 1 (*Susan T.*).) No disrespect is intended.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

We agree the Public Defender lacks authority to pursue the habeas corpus petition on Michelle's behalf. Supreme Court precedent establishes the Public Defender may not pursue a section 4800 habeas corpus petition on a developmentally disabled person's behalf without establishing "'*very exceptional circumstances*'" (*In re Hop* (1981) 29 Cal.3d 82, 86-87 (*Hop*), original italics) and that other available remedies for challenging the placement are inadequate (*In re Gandolfo* (1984) 36 Cal.3d 889, 897-900 (*Gandolfo*)). We conclude very exceptional circumstances are not present in this case and the existing remedies are adequate because Michelle's Fairview placement has been subject to periodic judicial review for nearly 20 years, a hearing on the next periodic review already was scheduled when the Public Defender filed the habeas corpus petition, and the Public Defender failed to show George is not acting in Michelle's best interest.

Although we agree with George the Public Defender may not pursue its habeas corpus petition, we do not agree with his contention the Lanterman Act's administrative fair hearing procedures deprive the trial court of jurisdiction to periodically review Michelle's placement. The fair hearing procedures provide the exclusive means for challenging a specific decision to change Michelle's placement or the other services she receives, but those procedures do not prevent the trial court from periodically reviewing whether her developmental center placement is still warranted. In *Hop*, the Supreme Court held that a developmentally disabled person could not be placed in a developmental center under the Lanterman Act without a judicial hearing on whether the person's disabilities warrant placement in the most restrictive environment available. Because placement in a developmental center constitutes a significant restraint on the developmentally disabled person's fundamental liberty interests, the *Hop* court concluded the person's due process and equal protection rights require a judicial determination regarding the suitability of the placement. As explained below, we conclude *Hop*'s rationale also requires periodic independent reviews to ensure the developmentally disabled person's disability continues to warrant placement in a developmental center.

3

We also conclude the trial court properly refused to allow George to replace the Public Defender as Michelle's appointed counsel with a private attorney he retained to represent her. As explained below, Michelle has a right to independent appointed counsel on the periodic *Hop* reviews because she has a significant liberty interest in her placement. Allowing George to both seek Michelle's continued placement at Fairview and select Michelle's counsel for the judicial review regarding that placement would render Michelle's right to independent counsel illusory. George may ask the trial court to appoint new counsel for Michelle if he believes the Public Defender is not providing effective representation and the trial court must give George a full opportunity to state the reasons for that request.

Accordingly, we issue a writ of mandate directing the trial court to (1) enter an order dismissing the habeas corpus petition the Public Defender filed on Michelle's behalf; (2) proceed with the *Hop* review hearing on Michelle's Fairview placement; and (3) hear and decide any request by George to appoint new counsel for Michelle.

I

LEGAL BACKGROUND

To explain the roles performed by the various persons and entities involved in Michelle's Fairview placement, and to put the parties' contentions in the proper context, we begin by providing an overview of the principal statutory scheme at issue, the Lanterman Act, and two related statutory schemes, the Lanterman-Petris-Short Act (LPS Act; § 5000 et seq.) and section 6500 et seq. These acts authorize confinement of developmentally disabled or mentally ill persons in a state developmental center (also referred to as a state hospital in some statutes) when certain conditions are satisfied. We also summarize the Supreme Court's *Hop* decision and the limits it places on a developmentally disabled person's commitment to a developmental center under the Lanterman Act.

4

A.    *The Lanterman Act*

"Enacted in 1977, the Lanterman Act establishes a comprehensive scheme for providing services to people with developmental disabilities." (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 682 (*Capitol People*).) The Act's stated purpose is to establish "[a]n array of services and supports . . . which is sufficiently complete to meet the needs and choices of each person with developmental disabilities, regardless of age or degree of disability, and at each stage of life and to support their integration into the mainstream life of the community." (§ 4501.)

A "'[d]evelopmental disability'" is "a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual." (§ 4512, subd. (a).) The term includes "mental retardation, cerebral palsy, epilepsy, and autism," but does not include "other handicapping conditions that are solely physical in nature." (*Ibid*.)

The state contracts with private nonprofit corporations to establish and operate a network of 21 regional centers that are responsible for determining eligibility, assessing needs, and coordinating and delivering direct services to developmentally disabled persons and their families. (*Capitol People*, *supra*, 155 Cal.App.4th at pp. 682-683.) The regional centers' purpose is to "assist persons with developmental disabilities and their families in securing those services and supports which maximize opportunities and choices for living, working, learning, and recreating in the community." (§ 4640.7, subd. (a).) The state "allocates funds to the centers for operations and the purchasing of services, including funding to purchase community-based services and supports. [Citations.]" (*Capitol People*, at p. 683.)

"The specific rights of persons with developmental disabilities and the corresponding obligations of the state are determined through an individual program plan (IPP) procedure that meets common statutory requirements. (§§ 4646-4648.) The IPP is developed by a planning team that includes the [developmentally disabled person], his or

5

her legally authorized representative, and one or more regional center representatives. (§ 4512, subd. (j).) The goals and objectives developed through the IPP process should maximize opportunities for the individual to be part of community life; enjoy increased control over his or her life; acquire positive roles in community life; and develop the skills to accomplish the same. (§ 4646.5, subd. (a)(2).)" (*Capitol People*, *supra*, 155 Cal.App.4th at p. 683.)

Before July 1, 2012, a nondangerous, developmentally disabled person could be admitted to a state developmental center in two ways. First, the person could submit a written admission application if he or she "is in such condition of mind as to render him competent to make [the application]." (§ 6000, subd. (a)(1).) Second, section 4825 authorized admission "upon the application of the person's parent or conservator in accordance with the provisions of Sections 4653 and 4803." (See also § 6000.5.) Section 4653 states "no developmentally disabled person shall be admitted to a state hospital except upon the referral of a regional center." Section 4803 provides that a regional center may not recommend admission of a developmentally disabled person to a community care or health facility unless the regional center certifies the person to be admitted or the person's parent or conservator does not object. Section 4825 does not limit the length of a developmentally disabled person's commitment, nor does it require judicial review of the placement.

Effective July 1, 2012, the Legislature amended the Welfare and Institutions Code to prohibit nondangerous, developmentally disabled persons from being admitted to state developmental centers. (§§ 4507, 7505.) Section 7505 now provides that a person shall *not* be admitted to a state developmental center unless the person is developmentally disabled *and* the person is: (1) committed by a court to Fairview Developmental Center because the person is a danger to self or others under section 6500 and is suffering an acute crisis as defined in section 4418.7; (2) committed by a court to the Porterville Developmental Center's secure treatment program through the criminal

6

justice system or juvenile court system; or (3) a prior resident of a developmental center who was provisionally released no more than 12 months earlier.

These recent Welfare and Institution Code amendments do not require moving nondangerous, developmentally disabled persons living in a state developmental center on July 1, 2012, to a different facility. Instead, the amendments require the regional center responsible for the committee to conduct a comprehensive assessment and "identify the types of community-based services and supports available to the [person]." (§ 4418.25, subd. (c)(2)(A) & (B).) The regional center must then provide the assessment to the individual program planning team to assist it in determining the least restrictive environment for the committee. (§ 4418.25, subd. (c)(2)(D).)

"[T]he Lanterman Act guarantees an applicant for or recipient of services or his or her representative 'who is dissatisfied with any decision or action of [a regional center or developmental center]' the right to an administrative fair hearing. [Citation.]" (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1459 (*Whitley*); § 4704.) The fair hearing procedures are designed to decide "all issues concerning the rights of persons with developmental disabilities to receive services under [the Act]." (§ 4706, subd. (a).) The fair hearing procedures include "detailed provisions for claimants who wish to attempt to resolve the issue through a voluntary informal meeting or through voluntary mediation before proceeding to an administrative fair hearing. [Citations.]" (*Whitley*, at pp. 1459-1460.) If the claimant chooses to proceed to an administrative fair hearing, the Lanterman Act guarantees the claimant a prehearing exchange of potential witnesses and documentary evidence, the opportunity to present witnesses and evidence, the opportunity to cross-examine all opposing witnesses, the right to appear through counsel or other representatives, and a written decision by the hearing officer. (*Id*. at pp. 1460-1461.) Either side may seek judicial review of the administrative decision through a writ of administrative mandamus. (See *In re Michael K.* (2010) 185 Cal.App.4th 1112, 1126 (*Michael K.*).)

7

B.    *The LPS Act*

The LPS Act "governs the involuntary treatment of the mentally ill in California." (*Susan T.*, *supra*, 8 Cal.4th at p. 1008.) It "is intended to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders who are either dangerous or gravely disabled." (*Ford v. Norton* (2001) 89 Cal.App.4th 974, 977.) A person is "'gravely disabled'" under the LPS Act if the "person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) The term "does not include mentally retarded persons by reason of being mentally retarded alone." (§ 5008, subd. (h)(3).)

When probable cause exists to believe a mental disorder makes a person "a danger to others, or to himself or herself, or gravely disabled," the LPS Act authorizes a peace officer or certain mental health professionals to detain the person for a 72-hour treatment and evaluation period. (§ 5150.) Following that period, the person may be detained for increasingly longer periods depending on the results of the initial evaluation and treatment. (See, e.g., § 5250 [additional intensive 14-day treatment period if person remains "a danger to others, or to himself or herself, or gravely disabled"]; § 5260 [second intensive 14-day treatment period if the person is suicidal]; § 5270.15 [additional 30-day treatment period if person remains gravely disabled, he or she is unwilling to voluntarily accept treatment, and the county board of supervisors authorized 30-day treatment periods]; § 5300 [additional 180-day commitment if person is imminently dangerous]; § 5304, subd. (b) [second 180-day commitment if person remains imminently dangerous].)

The 14-day and 30-day confinements require a certification hearing before a court-appointed commissioner or hearing officer to determine whether probable cause exists for the detention unless the person has filed a habeas corpus petition seeking judicial review of the confinement. (§§ 5256, 5256.1, 5262, 5270.15, 5275, 5276;

8

*Susan T.*, *supra*, 8 Cal.4th at p. 1009.) The confined person has a right to appointed counsel at any hearing on a habeas corpus petition. (§§ 5275, 5276.) The 180-day commitments require a trial court order following a judicial hearing at which the confined person is entitled to appointed counsel, a jury trial, proof beyond a reasonable doubt, and a unanimous verdict on whether he or she is imminently dangerous. (§§ 5301-5303; *Susan T.*, at p. 1009; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 230-233 (*Roulet*).)

The LPS Act also authorizes the trial court to appoint a conservator for a gravely disabled person (§ 5350) so that she may receive individualized treatment, supervision, and placement (§ 5350.1). The proposed conservatee is entitled to appointed counsel, a jury trial, proof beyond a reasonable doubt, and a unanimous verdict on the question of whether the person is gravely disabled. (§§ 5350, subd. (d); 5365; *Conservatorship of Christopher A.* (2006) 139 Cal.App.4th 604, 611.) Before July 1, 2012, an LPS conservator had the power to place the conservatee in a state developmental center or other locked treatment facility if the conservator determined it was the least restrictive placement.[3] (§§ 5353, 5358, 6000, subd. (a)(1); *In re Violet C.* (1989) 213 Cal.App.3d 86, 91 (*Violet C.*).) Following the recent amendments to the Welfare and Institutions Code, an LPS conservator no longer has authority to place a conservatee in a state developmental center, but the conservator retains all other powers regarding the conservatee's placement. (§§ 6000, subds. (a) & (c); 7505.) An LPS conservatorship automatically terminates after one year unless the conservator successfully petitions the court to reestablish the conservatorship. (§§ 5361-5362.)

---

[3] A conservator appointed under the Probate Code lacks the authority to place the conservatee in a locked facility. (*People v. Karriker* (2007) 149 Cal.App.4th 763, 780 (*Karriker*) ["'The primary difference between a Probate Code conservator and an LPS conservator is the LPS conservator's power to place the conservatee in a locked facility, an action that a Probate Code conservator cannot take'"].)

9

C.     *Judicial Commitments Under Section 6500 et seq.*

Section 6500 authorizes the district attorney, or county counsel if designated by the board of supervisors, to petition the trial court for an order involuntarily committing a developmentally disabled person who is a danger to self or others.  (§ 6500, subd. (b)(5).)  The petition may be brought at the request of the parent, guardian, conservator, or other person charged with the support of the developmentally disabled person, the regional center director or his or her designee, or several other statutorily designated individuals.[4]  (§ 6502.)  The person who may be committed has a right to appointed counsel, a jury trial, proof beyond a reasonable doubt, and a unanimous verdict regarding the petition.  (§ 6500, subd. (b)(5); *Roulet*, *supra*, 23 Cal.3d at p. 235.)

Before July 1, 2012, if the trial court found the person to be developmentally disabled and a danger to himself, herself, or others, the court could order the person committed to the State Department of Developmental Services for suitable treatment and habilitation services.  (Former § 6509; see Stats. 1996, ch. 1076, § 8.5, p. 7268.)  Former section 6509, subdivision (a), defined suitable treatment and habilitation services as the least restrictive residential placement necessary to achieve the purposes of the treatment, and included any state hospital, state developmental center, community care facility, or health facility the court found to be the most appropriate alternative following a hearing on the subject.  The commitment order automatically expired one year after it was made.  (Former § 6500; Stats. 1996, ch. 1076, § 5, p. 7265.)

---

[4]     Section 6500 et seq. addresses not only developmentally disabled persons who are dangerous to themselves or others, but also developmentally disabled persons who have been committed because they are incompetent to stand trial for a crime with which they are charged.  (§§ 6500, subds. (b)(1), (c)(1), 6502, 6509, subds. (a) & (b), 7505, subd. (a)(3).)  We focus on the statutory provisions relating to committing developmentally disabled persons who, like Michelle, have not been charged with a crime or committed because they are incompetent to stand trial.

Effective July 1, 2012, the trial court may not commit a dangerous, developmentally disabled person to the State Department of Developmental Services unless it also finds the person is dangerous due to an acute crisis as defined in section 4418.7.[5]  (§§ 6500, subd. (b)(1) & (2), 6509, subd. (a)(2), 7505, subd. (a)(2).)  Under the current statutory scheme, the commitment order automatically expires six months after it was made unless the trial court grants the regional center's written request to extend the commitment.  The total commitment period, however, may not exceed one year.  (§ 6500, subd. (c)(2).)

D.     *The* Hop *Decision*

In *Hop*, the California Supreme Court examined the constitutionality of section 4825 of the Lanterman Act, which, as explained above, allows the indefinite confinement of a developmentally disabled person in a developmental center based on a request by the person's parent or conservator, a recommendation by a regional center, and the absence of any objection from the person or her representative.  (*Hop*, *supra*, 29 Cal.3d at pp. 87-88.)  Irene Hop was a developmentally disabled adult without a guardian or conservator.  For several years, she lived in a community-based home that met all of her needs.  Hop's mother, however, transferred her to a developmental center based solely on Hop's failure to object to the transfer and the concurrence of the regional center and developmental center staff.  A public defender challenged the transfer by filing a habeas corpus petition on Hop's behalf, alleging her disability prevented her from

_____

[5]     Section 4418.7, subdivision (d)(1) defines an "'acute crises'" as "a situation in which the consumer meets the criteria of Section 6500 and, as a result of the consumer's behavior, all of the following are met:  [¶]  (A)  There is imminent risk for substantial harm to self or others.  [¶]  (B)  The service and support needs of the consumer cannot be met in the community, including with supplemental services as set forth in subparagraph (E) of paragraph (9) of subdivision (a) of Section 4648 and emergency and crisis intervention services as set forth in paragraph (10) of subdivision (a) of Section 4648.  [¶]  (C)  Due to serious and potentially life-threatening conditions, the consumer requires a more restrictive environment for crisis stabilization."

11

objecting and therefore the developmental center could not rely on her failure to contest the transfer. The trial court denied the petition without conducting a hearing. (*Id*. at pp. 85-86.) The Supreme Court found the trial court's refusal to hear the petition improper. The high court nonetheless denied the petition because it could not conduct the evidentiary hearing required to determine whether Hop's transfer was appropriate, but instructed the public defender to renew Hop's petition in the trial court. (*Id*. at pp. 94-95.)

The *Hop* court first examined whether a section 4825 placement in a developmental center violated a developmentally disabled person's due process rights because that provision did not require a judicial hearing on the need for the placement. The court explained that personal liberty is a fundamental right the United States and California Constitutions guarantee to all individuals, including individuals with developmental disabilities, and placing a person in a developmental center constituted a significant restraint on the person's liberty interests. Accordingly, the *Hop* court concluded that confinement in a developmental center required application of criminal due process standards to test its validity, including a judicial hearing to determine whether the person's disabilities warranted the confinement. (*Hop*, *supra*, 29 Cal.3d at pp. 89, 92.)

The state hospital opposed a judicial hearing because persons placed in a developmental center under section 4825 are voluntary admittees who have the right to either prevent their confinement by objecting to it or terminate it by requesting to leave the center once they are admitted. (*Hop*, *supra*, 29 Cal.3d at p. 90.) The *Hop* court rejected this argument, pointing out that it only highlighted the need for a judicial hearing to test the grounds for the placement. Under the statutory scheme, developmentally disabled persons could voluntarily admit themselves to a developmental center under section 6000, subdivision (a), only if they were competent to make that decision, but developmentally disabled persons who were not competent to make that decision were

12

nonetheless deemed to consent to placement in a developmental center under section 4825 because they failed to object and had the right to terminate the placement. (*Hop*, at pp. 90-91.)  Because a person lacking competency to decide whether to seek admission also lacks competency to consent to placement in a developmental center, the *Hop* court concluded a developmentally disabled person placed in a developmental center under section 4825 "may not be deemed a 'voluntary' admittee" and therefore due process required a judicial hearing to test whether the placement was appropriate.  (*Hop*, at p. 92.)

The *Hop* court also considered whether equal protection rights required a judicial hearing before a developmentally disabled person could be placed in a developmental center under section 4825.  The court explained that no other group of similarly situated adults in need of protective custody could be lawfully placed in a developmental center without a knowing and intelligent waiver of rights or a judicial determination that placement was appropriate, and the developmental center failed to offer any rational basis for that disparate treatment.  (*Hop*, *supra*, 29 Cal.3d at p. 92.)  Consequently, the *Hop* court held that a developmentally disabled person "is entitled to a judicial hearing on the question of whether, because of developmental disability she is gravely disabled or a danger to herself or others and whether placement in a state hospital [under section 4825] is warranted."  (*Hop*, at p. 93.)

After comparing a proposed developmental center admittee under section 4825 to a proposed LPS conservatee and a proposed committee under section 6500 et seq., the *Hop* court concluded the proposed developmental center admittee "is entitled to the same congeries of rights" as the proposed conservatee and proposed committee.  Those rights include the right to a jury trial on demand, application of the beyond a reasonable doubt standard of proof, and appointed counsel.  (*Hop*, *supra*, 29 Cal.3d at pp. 93-94.)

13

*Hop* did not create a new nonstatutory means of involuntary judicial commitment or provide authority for confinement in a state developmental center not otherwise authorized by statute. (*Violet C.*, *supra*, 213 Cal.App.3d at p. 94.) Rather, *Hop* applied constitutional safeguards to an otherwise constitutionally infirm statutory scheme and held a person placed in a state developmental center under section 4825 must receive the same constitutional safeguards as a gravely disabled person confined under the LPS Act or as a danger to herself or others under section 6500 et seq. (*Violet C.*, at pp. 94-95; *Hop*, *supra*, 29 Cal.3d at pp. 92-94.)

II

FACTS AND PROCEDURAL HISTORY

Michelle is a 51-year-old, developmentally disabled adult with an estimated IQ of less than 23. She has been diagnosed with autistic disorder and other severe intellectual disabilities, and she is prone to maladaptive behavior, including pica (persistent eating of substances lacking nutritional value), slapping, and agitation. Michelle is minimally verbal with limited ability to comprehend others. She is ambulatory, but she cannot self-administer the many daily medications she requires, nor can she provide for her basic personal needs such as food, shelter, and clothing. For her own safety, Michelle requires regular supervision because she cannot appreciate basic safety hazards and lacks sufficient knowledge to independently access community facilities and services.

Michelle is the oldest of five children. In October 1972, her parents admitted her to Fairview at the age of 10. Michelle's father passed away in 1985. Her mother is still alive, but struggles with her own mental health issues and lives with Michelle's brother, George, and his wife and four sons. George regularly visits Michelle at Fairview and also brings her to his home for visits. George interacts with Michelle's medical and professional teams at Fairview to coordinate her care and treatment.

In August 1987, shortly after Michelle's father died, the trial court appointed George and Michelle's aunt, Coula, as Michelle's limited conservators under the Probate Code.[6]  The court granted George and Coula the power "[t]o fix the residence or specific dwelling of [Michelle], except at Fairview State Hospital *absent court approval*," give or withhold medical consent, and contract on Michelle's behalf.  (Italics added.)  The court has investigated and reviewed this limited conservatorship every two years, but has not found any grounds to modify or terminate it.  George and Coula are presently substituting another one of Michelle's brothers, Nick, for Coula because Coula's health prevents her from continuing to serve as a coconservator.

Since 1993 the trial court has annually reviewed the suitability of Michelle's Fairview placement under *Hop* and section 4825.  The Harbor Regional Center initiated each of these annual "*Hop* reviews" by requesting court approval for Michelle to remain at Fairview.  Each time the court conducted a *Hop* review, it appointed the Public Defender to serve as Michelle's attorney and ultimately approved Michelle's continued placement at Fairview subject to "further judicial review within one (1) year."

The Harbor Regional Center filed its most recent "*Hop* petition" in January 2011, explaining "there is no known suitable, legally available placement [for Michelle] that is less restrictive than the proposed state developmental center placement."  In response, the court again appointed the Public Defender to serve as Michelle's attorney and temporarily approved her continued placement at Fairview pending a hearing on the *Hop* petition.

In November 2012, while the most recent *Hop* petition remained pending, the Public Defender filed a habeas corpus petition on Michelle's behalf under section 4800, which provides every adult admitted to a state developmental center the

_____

6       George and Coula were not appointed as LPS conservators for Michelle.

15

right to petition for a hearing on whether the committee should be released.  The petition alleged Fairview unlawfully restrained Michelle's liberty because it is not the least restrictive placement for her.  The petition sought Michelle's release from Fairview, but provided no information on whether Fairview offered the least restrictive placement or where Michelle should be placed.

In early December 2012, George wrote the Public Defender to object to its habeas corpus petition filed on Michelle's behalf without his consent.  He explained the trial court appointed him as Michelle's coconservator with the power to fix her residence and select counsel to represent her in any legal proceeding.  George further explained he believed Fairview was the most suitable living environment for Michelle until the Harbor Regional Center or someone else identified a specific alternative placement that meets all of Michelle's needs.  Accordingly, George stated he hired attorney Jon L. Rewinski to represent Michelle on the pending *Hop* and habeas corpus petitions and he demanded the Public Defender (1) withdraw the habeas corpus petition, and (2) execute a substitution of attorney designating Rewinski as Michelle's attorney in place of the Public Defender.  The Public Defender did not respond to George's demands.

A few days later, the trial court conducted a hearing on the *Hop* and habeas corpus petitions.  Rewinski attempted to appear on Michelle's behalf, but the Public Defender objected because the trial court previously appointed it to represent Michelle.  The court agreed and explained it would not allow Rewinski to appear on Michelle's behalf unless the Public Defender voluntarily withdrew as Michelle's appointed counsel.  Rewinski informed the court George retained him to represent Michelle instead of the Public Defender and he requested the opportunity to submit a brief demonstrating George had the authority to replace appointed counsel with counsel of his choice.  The trial court refused to entertain the issue, explaining it already had decided the matter in another case and did not want any additional briefing.  The court then continued the hearing on the *Hop* and habeas corpus petitions.

16

In response, George filed the current petition for writ of mandate or prohibition on Michelle's behalf and sought an immediate stay of all trial court proceedings regarding Michelle's placement. George contends (1) the Public Defender lacks authority to pursue a section 4800 habeas corpus petition on Michelle's behalf and that petition should be dismissed; (2) the trial court lacks jurisdiction under *Hop* to review Michelle's Fairview placement and therefore the *Hop* petition should be dismissed; and (3) the trial court erred in refusing to allow George to substitute Rewinski for the Public Defender as Michelle's counsel. We ordered the Public Defender and Harbor Regional Center to show cause why a writ of mandate or prohibition should not issue. We also stayed all trial court proceedings on the habeas corpus and *Hop* petitions.[7]

III

DISCUSSION

A. *The Public Defender May Not Pursue the Habeas Corpus Petition on Michelle's Behalf*

The Public Defender filed the habeas corpus petition on Michelle's behalf under section 4800, which provides: "Every adult who is or has been admitted or committed to a . . . developmental center . . . as a developmentally disabled patient shall have a right to a hearing by writ of habeas corpus for his or her release from the . . .

---

[7]    The Public Defender contends we should dismiss the writ petition because Rewinski lacks "standing" to bring the current writ petition on Michelle's behalf. According to the Public Defender, it is Michelle's court-appointed counsel and therefore the only attorney authorized to take action on her behalf. The Public Defender, however, fails to cite any authority or provide any reasoned explanation to support its contention. (*Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862 ["'When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived'"].) Moreover, a party may seek mandamus relief to compel a trial court to recognize new counsel when the trial court refuses to allow a party to substitute attorneys. (8 Witkin, Cal. Procedure (5th ed. 2008) Extraordinary Writs, § 110, p. 1003; *Scott v. Superior Court* (1928) 205 Cal. 525, 526.)

17

developmental center . . . after he or she or any person acting on his or her behalf makes a request for release to any member of the staff of the . . . developmental center . . . or to any employee of a regional center." (§ 4800, subd. (a).) The Public Defender contends it properly filed the habeas corpus petition as a "person acting on [Michelle's] behalf." We disagree because the Public Defender failed to establish an appropriate basis for pursuing the petition.

In *Hop*, the Supreme Court addressed section 4800 and a public defender's standing to bring a habeas corpus petition on behalf of a developmentally disabled person who is unable to object to a developmental center placement. The *Hop* court acknowledged section 4800 authorizes a habeas corpus petition by anyone acting on a developmentally disabled person's behalf, but the court also pointed out its habeas corpus jurisprudence allows someone other than the detained person to bring a habeas petition "'[o]nly in *very exceptional circumstances*,'" and the petition must "'"set forth some reason or explanation . . . showing why the detained person [did] not sign [the petition] . . . .'"' [Citation.]" (*Hop*, *supra*, 29 Cal.3d at pp. 86-87, original italics.) Accordingly, although section 4800 authorizes a habeas corpus hearing, a person other than the developmentally disabled person must establish very exceptional circumstances to justify pursuing a habeas corpus petition on the developmentally disabled person's behalf because "'"[i]t was not intended that the writ of habeas corpus should be availed of, as a matter of course, by intruders or uninvited meddlers . . . . [Citation.] . . . .'"' [Citation.]" (*Hop*, at p. 87.)

The *Hop* court found exceptional circumstances supported the public defender's section 4800 habeas corpus petition. Those circumstances described in the petition alleged (1) Hop's disability deprived her of the "'ability to protest her transfer to a more restrictive placement'"; (2) Hop's mother initiated the developmental center placement with the concurrence of the regional center and developmental center staff, and therefore none of them reasonably could be expected to file a habeas corpus petition

18

challenging their own actions; and (3) Hop appeared incompetent to initiate or file a habeas corpus proceeding on her own behalf. (*Hop*, *supra*, 29 Cal.3d at p. 87.) In essence, no means existed for Hop to challenge her transfer to the state hospital other than the public defender's habeas corpus petition filed on her behalf.

The Supreme Court also has long recognized "habeas corpus is an extraordinary remedy that 'was not created for the purpose of defeating or embarrassing justice, but to promote it' [citation.] . . . ." (*In re Robbins* (1998) 18 Cal.4th 770, 777-778.) Indeed, habeas corpus is not a proper remedy where other adequate remedies exist, such as an appeal or other available procedures for challenging the confinement. (*Gandolfo*, *supra*, 36 Cal.3d at pp. 898-899.) In *Gandolfo*, the Supreme Court held a habeas corpus petition was not an appropriate means to challenge an LPS conservatee's confinement in a developmental center because the LPS Act provided ample means for the conservatee to challenge both the conservatorship and his developmental center placement, and the habeas corpus petition did not allege any extraordinary circumstances rendering those procedures inadequate. (*Id*. at pp. 897-900.)

Here, the record shows there are no exceptional circumstances that justify the Public Defender filing the habeas corpus petition on Michelle's behalf or show the remedies otherwise available to address Michelle's Fairview placement are inadequate. Unlike the situation in *Hop*, we are not concerned with Michelle's initial placement at Fairview for an indefinite period of time without a judicial hearing. Michelle has lived at Fairview for more than 40 years. Since 1993 Michelle has been at Fairview under a series of one-year placements subject to annual judicial reviews. The most recent of these *Hop* reviews was pending and set for hearing when the Public Defender filed the habeas corpus petition. As explained above, the *Hop* review process assures Michelle not only legal representation but also a jury trial and application of the beyond reasonable doubt standard of proof on the scope of her disabilities and whether her disabilities warrant her developmental center placement. The Public Defender provides no

19

explanation why the pending *Hop* review is an inadequate means for evaluating Michelle's Fairview placement.

To the contrary, the Public Defender suggested a section 4800 habeas corpus petition provides a means to circumvent the *Hop* review process. The Public Defender argued in the trial court that section 4800 authorized it to file the habeas corpus petition and allow the trial court to decide whether Michelle's Fairview placement would be appropriate, rather than go through the *Hop* review process and present that issue to a jury. This argument turns the function and purpose of habeas corpus on its head. As explained above, habeas corpus is appropriate only when there are no other available and adequate remedies; it may not be used to avoid otherwise available and adequate remedies.[8] (*Gandolfo*, *supra*, 36 Cal.3d at pp. 898-899.)

Moreover, unlike *Hop*, Michelle has court-appointed conservators who are authorized to act on her behalf in selecting her residence. (See *Michael K.*, *supra*, 185 Cal.App.4th at p. 1128, fn. 14 [exceptional circumstances did not exist to allow public defender to pursue section 4800 habeas corpus petition because developmentally disabled person had court-appointed conservators who were competent and authorized to decide whether the person should remain in a state developmental center].) The Public Defender and Harbor Regional Center contend there is evidence that Michelle's conservators are preventing the Harbor Regional Center from determining whether there is a less restrictive placement that would meet Michelle's needs, and therefore we may not rely on the conservators' involvement to conclude the Public Defender lacks authority to pursue the habeas corpus petition. We disagree.

---

[8] We do not suggest that a developmentally disabled person or anyone acting on his or her behalf must always await the next *Hop* review to challenge the person's placement in a state developmental center or other facility. Rather, we simply conclude a section 4800 habeas corpus petition may not be used when there are other adequate and available remedies for challenging the placement. Here, the *Hop* review process was adequate because it was already underway and a hearing was scheduled.

20

Neither the Public Defender nor Harbor Regional Center cite any evidence in the record showing Michelle's conservators prevented the regional center from fully assessing Michelle and her needs or otherwise identifying any less restrictive placements. The Harbor Regional Center argues it cannot identify other possible placements for Michelle without her conservators' cooperation because it may not disclose confidential information about Michelle to potential service providers without their consent. (See generally § 4514.) But section 4514 includes numerous exceptions to the consent requirement, including disclosure to "qualified professional persons . . . in the provision of intake, assessment, and services or appropriate referrals." (§ 4514, subd. (a).) Consent is required only when disclosure is made to "a program not vendored by a regional center or developmental center." (*Ibid.*) The Harbor Regional Center cites no evidence showing Michelle's conservators can or have thwarted the placement process through lack of cooperation.

We do not suggest that a Probate Code conservator's involvement in a developmentally disabled person's placement bars a public defender from pursuing a habeas corpus petition on the person's behalf whenever the conservator objects. Rather, we merely conclude the conservator's involvement is *a* factor the court may consider in determining whether exceptional circumstances justified the public defender's section 4800 habeas corpus petition. (See *Michael K.*, *supra*, 185 Cal.App.4th at p. 1123, fn. 8 [public defender may act contrary to conservator's instructions in extraordinary circumstances].) For example, if there was evidence showing the conservator failed to act in the developmentally disabled person's best interests or prevented a proper assessment or identification of possible community-based services, the court could consider those circumstances in deciding whether exceptional circumstances exist. Here, the Public Defender failed to show either extraordinary circumstances or that other remedies were inadequate.

21

The Public Defender argues section 4800 and *Hop* authorize it to file a habeas corpus petition any time a developmentally disabled person placed in a state developmental center or other facility is incapable of filing a petition on her own behalf. The Public Defender reads these authorities too broadly. As explained above, *Hop* authorized a public defender to pursue a habeas corpus petition on Hop's behalf because there was no one else to do so and no other means to obtain an independent review of Hop's state hospital placement. At the time, the right to a judicial hearing or any other remedy did not exist. *Hop* nonetheless requires "'*very exceptional circumstances*'" for a public defender or anyone other than the detained person to file a section 4800 habeas corpus petition, and the petition must allege facts establishing those circumstances. (*Hop*, *supra*, 29 Cal.3d at pp. 86-87, original italics.) A public defender simply may not pursue a section 4800 habeas corpus petition as a matter of course.

The Public Defender contends *In re Borgogna* (1981) 121 Cal.App.3d 937, supports its interpretation of section 4800 and *Hop*. *Borgogna* declared a public defender has standing to pursue a habeas corpus petition on a developmentally disabled person's behalf if the person is not competent to do so. (*Borgogna*, at p. 945.) This statement, however, is dicta. (*Ibid*.) In *Borgogna*, the public defender joined with the regional center in bringing an earlier habeas corpus petition, but the trial court denied the petition because it was not filed by the developmentally disabled person, who was competent and opposed the petition. The issue in *Borgogna* concerned a later petition the regional center filed on its own in the Court of Appeal. (*Borgogna*, at p. 940.) The *Borgogna* court found the regional center could pursue the petition because the statutory scheme vested it with authority to decide the disabled person's placement and therefore the center could defend its own placement decision. The *Borgogna* court did not analyze or consider the public defender's authority to pursue a habeas corpus petition nor did it discuss *Hop*'s very exceptional circumstances requirement. (*Id*. at p. 946.) An opinion is not authority for issues it did not consider or decide. (*People v. Knoller* (2007)

22

41 Cal.4th 139, 154-155; *People v. Dunbar* (2012) 209 Cal.App.4th 114, 118.)  We therefore find *Borgogna* inapplicable.

We note the trial court appointed the Public Defender to serve as Michelle's counsel for the pending *Hop* review.  Assuming that appointment would otherwise authorize the Public Defender to file a habeas corpus petition on Michelle's behalf, it does not authorize the Public Defender to pursue the current petition.  As explained above, the record does not show the pending *Hop* review is an inadequate remedy for testing the validity of Michelle's placement at Fairview.  Accordingly, the Public Defender may not pursue the current habeas corpus petition on Michelle's behalf.

B.      *The Trial Court Has Jurisdiction To Review Michelle's Section 4825 Placement at Fairview*

1.      *Hop* Requires an Initial Review of the Placement

George contends the trial court lacked authority to review Michelle's Fairview placement because *Hop* does not apply to Michelle's placement.  According to George, *Hop* and its judicial hearing requirement only apply "when a developmentally disabled adult is placed in a state developmental center 'at the request of one not so legally authorized.'"  In George's view, the *Hop* hearing requirement does not apply here because Michelle's parents were legally authorized to place her in Fairview as a minor in 1972, and George and Coula were legally authorized to maintain that placement when the trial court first reviewed it in 1993.  George misconstrues *Hop* and its rationale for requiring a judicial hearing.

Following *Hop*, a judicial hearing is required before a nonconsenting developmentally disabled person may be placed in a state developmental center under section 4825.  It is the request to place the developmentally disabled person in a developmental center that triggers *Hop*'s judicial hearing requirement, not the authority of the person making the request. (*Hop*, *supra*, 29 Cal.3d at pp. 92-93.)  *Hop* requires a judicial hearing for a section 4825 placement because the placement is essentially an

23

involuntary civil commitment *and* because other similarly situated individuals cannot be placed in a developmental center without a judicial hearing. (*Hop*, at pp. 89-94.) Indeed, *Hop* requires a judicial hearing to test the basis of a proposed section 4825 placement, whether or not the person requesting the placement lacks authority to do so (*Hop*, at pp. 86, 87, 92-94 [judicial hearing required for section 4825 placement requested by parent who was not the developmentally disabled adult's conservator or guardian]) or has been expressly granted the authority to do so (*North Bay Regional Center v. Sherry S.* (1989) 207 Cal.App.3d 449, 460-461 (*Sherry S.*) [judicial hearing required for section 4825 placement requested by duly appointed conservator].)

As the appellate court in *Sherry S.* explained, "The rationale of *Hop* is that a developmentally disabled adult who is putatively unable to consent to the deprivation of liberty entailed in state hospitalization cannot be so deprived without a hearing. For purposes of this rationale, we see no reason to distinguish between hospitalizations initiated by parents and those initiated by conservators." (*Sherry S.*, *supra*, 207 Cal.App.3d at p. 461; *Violet C.*, *supra*, 213 Cal.App.3d at p. 96.) Indeed, the authority of the person requesting the section 4825 placement cannot determine whether a judicial hearing is required because the only way to challenge that authority would then be through a section 4800 habeas corpus petition *after* the developmentally disabled person is placed in a developmental center. That result does not comport with *Hop*'s due process and equal protection rationale.

George's reliance on a single sentence in *Hop* is unavailing. He constructs his entire argument that a *Hop* hearing is not required here based on the italicized language in the following sentence: "From all of the foregoing considerations we conclude that a developmentally disabled adult placed in a state hospital *at the request of one not so legally authorized* (see, e.g., § 5358) may not be deemed a 'voluntary' admittee because he or she neither requested nor knowingly agreed to the placement." (*Hop*, *supra*, 29 Cal.3d at p. 92, italics added.) George misinterprets this passage because

24

he fails to consider its context. This language appears in a section of the *Hop* decision addressing whether a person placed in a developmental center under section 4825 should be considered a voluntary admittee who waived the right to a judicial hearing. That section of the opinion does not limit the right to judicial review to placements requested by unauthorized persons. In any event, we note the letters of conservatorship appointing George required court approval before he could fix Michelle's residence at Fairview. Accordingly, George had no authority to place or keep Michelle in Fairview without judicial review and approval.

Michelle's initial placement at Fairview when she was a minor and several years before the Supreme Court announced the *Hop* decision in no way affects the trial court's jurisdiction to review Michelle's Fairview placement. Michelle was an adult when the Supreme Court announced the *Hop* decision in 1981 and when the trial court first reviewed her Fairview placement in 1993. The hearing rights *Hop* established to make a section 4825 placement constitutional apply not only to Hop and all developmentally disabled persons placed in a development center after the *Hop* decision, but also to all developmentally disabled persons who were subject to a section 4825 placement when the Supreme Court issued the *Hop* decision. (*Hop*, *supra*, 29 Cal.3d at p. 94 ["Our holding does not require the immediate release either of Hop or of those presently held in state hospitals under the authority of section 4825"].) Allowing Michelle to remain indefinitely at Fairview under section 4825 without any judicial review would be unconstitutional under *Hop*.

Accordingly, we conclude the trial court had jurisdiction to review Michelle's Fairview placement when it first did so in 1993 because *Hop* required the court to conduct at least an initial review to ensure the placement was warranted.

25

2.     *Hop* Requires Periodic Reviews of the Placement

Assuming the trial court had authority to conduct an initial *Hop* review, George contends the trial court nonetheless lacks authority to conduct periodic *Hop* reviews regarding Michelle's ongoing placement at Fairview because the *Hop* decision did not create ongoing jurisdiction to hear challenges to placement decisions or otherwise review existing placements. According to George, the Lanterman Act's fair hearing procedures offer the exclusive means for hearing challenges to Michelle's ongoing Fairview placement. This argument fails because it would require us to ignore the terms of the court orders approving Michelle's Fairview placement and the limited purpose of periodic *Hop* reviews.

The initial judicial determination regarding Michelle's Fairview placement occurred in 1993 when the trial court approved the placement subject to "further judicial review within one (1) year." Since then, Michelle has remained at Fairview under a series of court orders approving her placement subject to annual judicial reviews. Every court order approving the placement reserved jurisdiction for the court to do so. Indeed, each time Michelle's Fairview placement came up for review, it was essentially a new placement requiring judicial review regardless of whether the trial court had continuing jurisdiction because the authorization for the previous placement had expired. George does not dispute the trial court's authority to approve Michelle's Fairview placement for a limited time subject to further judicial review, and therefore his challenge to the trial court's jurisdiction to periodically review Michelle's placement fails.

We nonetheless consider whether *Hop* itself provides the trial court with authority to periodically review Michelle's placement to determine whether her disabilities continue to justify placement in a developmental center. Although *Hop* addressed only a developmentally disabled person's initial placement, we find its rationale for requiring judicial review equally applicable to the committee's ongoing placement. As explained above, *Hop* found a developmentally disabled person's initial

26

placement without a judicial hearing violated the person's due process and equal protection rights because it significantly impairs the person's fundamental right to personal liberty, and no other class of similarly situated adults may be placed in a developmental center without a judicial determination that the placement is appropriate. (*Hop*, *supra*, 29 Cal.3d at pp. 89-92.)

The impairment of the committee's personal liberty is not diminished by residing in the developmental center for an extended period of time, especially when there are continuing advancements in both the treatment of numerous disabilities and the availability of less restrictive services in community-based and other facilities. No other class of similarly situated adults may lawfully remain in a state developmental center indefinitely without further judicial review of their ongoing placement. For example, the LPS Act and section 6500 et seq. place limits on the length of confinement for a gravely disabled person or a person believed to be a danger to self or others, and both statutory schemes also require judicial review to recommit the person or extend the initial confinement. (See, e.g., §§ 5150, 5250, 5260, 5270.15, 5300, 5304, subd. (b) [limiting LPS confinements to 72 hours, 14 days, 30 days, or 180 days depending on person's condition]; §§ 5256, 5256.1, 5262, 5270.15, 5275, 5276, 5301, 5302, 5303 [requiring a court or certified hearing officer to review all LPS confinements except initial 72-hour confinement and all extensions or recommitments]; §§ 6500, subd. (c)(2), 6502, 6503 [limiting commitments to six months and requiring judicial hearing for initial commitment and any extension or recommitment].)

The Lanterman Act does not limit the length of a section 4825 placement or require judicial review of the placement. Accordingly, unless *Hop* requires a further judicial review of a section 4825 placement, Michelle and others similarly situated could face a lifetime placement in a developmental center based solely on an initial judicial determination regarding the placement's suitability. We see no basis to justify the lifetime placement of a nondangerous developmentally disabled person under

27

section 4825 based solely on an initial judicial review. George does not adequately explain why the Legislature under the LPS Act and section 6500 et seq. limited the commitment time of a dangerous developmentally disabled person or a gravely disabled person placed in a developmental center and also guaranteed those individuals further judicial review, but omitted those protections for section 4825 placements. That result is simply inconsistent with the constitutional principles articulated in *Hop*.

George contends Michelle and other developmentally disabled persons placed in a developmental center are not similarly situated to other developmental center residents because section 4825 admittees voluntarily agree to the placement. According to George, persons placed under section 4825 are free to leave the developmental center any time they or their legal representatives choose, unlike those placed under the LPS Act, section 6500 et seq., or other statutory provisions. *Hop*, however, rejected this identical argument. As explained above, *Hop* concluded developmentally disabled persons incapable of objecting to their placement because of their disabilities are not voluntary admittees. A person may not be considered a voluntary admittee under section 4825 unless he or she is competent to request or consent to the placement. (*Hop*, *supra*, 29 Cal.3d at pp. 90-92.) Appointing a conservator for the developmentally disabled person does not change that conclusion; the placement remains involuntary and a judicial hearing is required. (*Sherry S.*, *supra*, 207 Cal.App.3d at p. 461; *Violet C.*, *supra*, 213 Cal.App.3d at p. 96.)

We acknowledge *Michael K.* and *Whitley* concluded *Hop* did not provide "ongoing jurisdiction in the superior court to hear challenges to placement decisions or simply review an existing placement," explaining that "'[t]he due process concerns for retention in a development[al] center are not the same due process concerns that are present when a developmentally disabled individual is first involuntarily committed.'" (*Michael K.*, *supra*, 185 Cal.App.4th at pp. 1127-1129; *Whitley*, *supra*, 155 Cal.App.4th at pp. 1465-1466.) As authority for that proposition, *Michael K.* and *Whitley* cite *Cramer*

28

*v. Gillermina R.* (1981) 125 Cal.App.3d 380, 393 (*Cramer*), without any analysis of that decision.  Upon examination, *Cramer* does not support their conclusion.

*Cramer* involved petitions to recommit several individuals to a state developmental center because the original orders committing them under section 6500 et seq. were expiring.  Following ex parte hearings on each petition, the trial court temporarily extended the commitment orders pending full recommitment hearings.  The committees challenged these temporary extensions, arguing they were constitutionally entitled to adversarial probable cause hearings before they could be temporarily held beyond their original commitments.  (*Cramer*, *supra*, 125 Cal.App.3d at pp. 384-385, 392.)  The committees cited *Hop* to support their position, but *Cramer* found *Hop* inapplicable because it did not address due process concerns arising from a recommitment under section 6500 et seq.  (*Cramer*, at p. 393.)

*Cramer* is inapplicable here for the same reason—it addresses a different type of confinement based on different authority.  At the time, section 6500 et seq. authorized a one-year judicial commitment for developmentally disabled persons who were a danger to themselves or others.  After one year, the commitment order automatically expired and the committee would be freed unless the district attorney petitioned for a recommitment order.  Without periodic *Hop* reviews a developmentally disabled person could be placed in a developmental center under section 4825 for the remainder of her life based only on an initial judicial review.  Consequently, *Cramer* does not support the conclusion that the due process concerns regarding retention in a state developmental center under section 4825 are different than the due process concerns regarding the initial section 4825 placement.

Moreover, in *Cramer*, the individuals received judicial hearings *before* the court made the temporary hold orders and the individuals were entitled to appear at those hearings and oppose the orders.  Those hearings were not full adversarial hearings with the right of cross-examination and other formal hearing rights, but they were judicial

hearings addressing the suitability of the temporary hold orders.  (*Cramer*, *supra*, 125 Cal.App.3d at pp. 392-393.)  The *Cramer* court also emphasized that the challenged orders were merely temporary pending a full judicial hearing where the committee would receive all formal hearing rights:  "Undoubtedly, our holding would be different if there were no available subsequent judicial hearing to test the recommitment."  (*Id*. at p. 392.)  Accordingly, *Cramer* held due process requires a judicial hearing before a recommitment and therefore does not support the conclusion the trial court has no ongoing jurisdiction to review a section 4825 placement after the court initially approves the placement.

We note two additional reasons why *Michael K.* and *Whitley* do not deprive the trial court of jurisdiction to conduct periodic *Hop* reviews.  First, neither decision addressed *Hop*'s equal protection rationale for requiring ongoing jurisdiction to review a developmental center placement.  Second, neither decision involved a periodic *Hop* review regarding an ongoing developmental center placement.  Instead, both *Michael K.* and *Whitley* involved attempts to circumvent the Lanterman Act's administrative fair hearing procedures by arguing *Hop* created ongoing jurisdiction for courts to hear challenges to specific placement decisions or otherwise review all aspects of any Lanterman Act placement.  (*Michael K.*, *supra*, 185 Cal.App.4th at pp. 1116-1117, 1127; *Whitley*, *supra*, 155 Cal.App.4th at p. 1465.)

Our reading of *Hop* is not inconsistent with *Michael K.*'s and *Whitley*'s conclusion that *Hop* does not provide the trial court with ongoing jurisdiction to hear challenges to specific placement decisions and review *all* aspects of existing placements. We read *Hop* simply to confer jurisdiction on the trial court to (1) conduct a hearing regarding the basis for initially placing a developmentally disabled person in a developmental center, and (2) periodically review whether the person's disabilities continue to support the significant restrictions the placement imposes on the committee's liberty interests.  This jurisdiction to periodically review the basis for a developmental

center placement is not jurisdiction to monitor the ongoing placement or make decisions regarding the details of the services the developmentally disabled person receives. [9]

Indeed, we emphasize *Hop* did not create a new procedure for placing a developmentally disabled person in a developmental center, nor did it create a nonstatutory procedure for challenging decisions regarding a developmentally disabled person's placement or other specific services. (*Violet C.*, *supra*, 213 Cal.App.3d at p. 94.) *Hop* merely imposed limits on an existing statutory procedure for placing a developmentally disabled person in a developmental center to ensure the restraint imposed on the disabled person's liberty interests did not violate the person's due process and equal protection rights. (*Sherry S.*, *supra*, 207 Cal.App.4th at p. 460, fn. 11; *Violet C.*, *supra*, 213 Cal.App.3d at pp. 94-95.) Accordingly, a *Hop* review only examines the level of confinement by asking whether the developmentally disabled person's disabilities warrant placement in the most restrictive type of facility available under the Lanterman Act. *Hop* does not apply to placement in a developmental center under any statutory provision other than section 4825, nor does it apply to placement in any facility other than a developmental center.[10]

---

[9] The parties did not brief what constitutes the appropriate interval between *Hop* reviews and that issue is not presented here because each order approving Michelle's Fairview placement specifically required the next review to occur within one year. Accordingly, we do not address the issue. We also note the recent amendments to the Welfare and Institutions Code will reduce and eventually eliminate the need for *Hop* reviews for two reasons. First, a developmentally disabled person may no longer be placed in a developmental center under section 4825 and that is the only type of placement to which *Hop* applies. (§ 7505.) Second, the recent amendments require regional centers to conduct regular, comprehensive reviews of developmentally disabled persons who resided in developmental centers before the amendments to identify community-based services that could meet the developmentally disabled person's needs. (§ 4418.25, subd. (c)(2).)

[10] The Public Defender argues the recent amendments to the Welfare and Institutions Code codified *Hop* hearings and therefore it is irrelevant whether *Hop* itself provided the superior court with ongoing jurisdiction to review state developmental

31

The Lanterman Act's administrative fair hearing procedures allow a developmentally disabled person to challenge any specific decision a regional center or developmental center makes to reduce, terminate, change, or deny that person services. (§§ 4706, 4710.) To challenge a decision the developmentally disabled person must invoke the fair hearing procedures within 30 days of receiving notice of the challenged decision. (§4710.5, subd. (a); *Whitley*, *supra*, 155 Cal.App.4th at p. 1460.) The fair hearing procedure's final outcome may be judicially reviewed through a writ of administrative mandamus. (See *Michael K.*, *supra*, 185 Cal.App.4th at p. 1126.)

In *Whitley*, the Court of Appeal held the fair hearing procedures provide the exclusive remedy for a developmentally disabled person's legal representative to object to a community placement decision.[11] (*Whitley*, *supra*, 155 Cal.App.4th at pp. 1462-1463, 1465.) The *Whitley* court reached that conclusion based on the exhaustion of administrative remedies doctrine. (*Id*. at pp. 1463-1464.) That doctrine

center placements. The Public Defender relies on section 6500, subdivision (b)(4), which states, "In the event subsequent petitions are filed with respect to a resident of a state developmental center or a state-operated community facility committed prior to July 1, 2012, the procedures followed and criteria for recommitment shall be the same as with the initial petition for commitment." The Public Defender misreads this statute.

Section 6500 is part of the statutory scheme for committing developmentally disabled persons who are dangerous to themselves or others. It is not part of the Lanterman Act and does not address a developmental center placement under section 4825, which is the only developmental center placement to which *Hop* applies. Moreover, following the recent amendments, developmentally disabled persons no longer may be placed in a developmental center under section 4825 (see § 7505), and therefore there are no statutory procedures and criteria for initially placing a developmentally disabled person in a developmental center under section 4825, in contrast to a placement under section 6500 et seq.

[11]    *Whitley*'s holding, however, must be qualified because, as *Hop* explained, section 4800 allows a developmentally disabled person or someone acting on his or her behalf to challenge the person's placement in exceptional circumstances and when the fair hearing procedure's remedies are inadequate. (*Hop*, *supra*, 29 Cal.3d at pp. 86-87; see also *Gandolfo*, *supra*, 36 Cal.3d at p. 898-900.) *Whitley* did not address section 4800.

32

provides that when the Legislature creates an administrative tribunal to adjudicate an issue before presenting it to the trial court, the party must first pursue its remedies with that tribunal because the issue falls within the administrative tribunal's special jurisdiction. Consequently, the courts may only "'*review*'" the tribunal's final determination. (*Id*. at p. 1464, original italics.)

Contrary to George's contention, the administrative fair hearing procedures do not deprive the trial court of jurisdiction to conduct periodic *Hop* reviews because the reviews serve a different purpose and are not within an administrative tribunal's special jurisdiction. *Hop* requires periodic independent reviews to ensure a section 4825 developmental center placement does not violate a developmentally disabled person's constitutional rights. The reviews ensure the person's disabilities continue to warrant placement in the most restrictive environment available under the Lanterman Act. In contrast, the fair hearing procedures provide an administrative process for a developmentally disabled person or her representative to challenge a regional center's or developmental center's decision to change the person's placement or other services. Through the process, a mediator or hearing officer with subject matter expertise resolves specific challenges to a decision changing the services the developmentally disabled person receives.

Moreover, the administrative procedures do not provide the same due process and equal protection safeguards as periodic *Hop* reviews. To protect a developmentally disabled person's personal liberty interests, *Hop* requires periodic independent reviews to ensure the person's disabilities continue to warrant developmental center placement even if there has been no change in the person's placement or other services since the last review. *Hop* requires these reviews to prevent the developmentally disabled person's representative, the regional center, and the developmental center from maintaining the placement indefinitely without any independent review. The administrative hearing procedures, however, provide for an independent administrative

review only if a developmentally disabled person or her representative requests a hearing within 30 days after receiving notice of the regional center's or developmental center's decision to change the person's placement or other services.  Even after the fair hearing procedures have been invoked, the developmentally disabled person's representative, the regional center, and developmental center may avoid a hearing by invoking the informal meeting and voluntary mediation provisions of the administrative hearing procedures to reach an agreement to maintain the developmental center placement.  That is precisely the situation *Hop* sought to avoid by imposing its judicial hearing requirement.  Here, the fair hearing procedures did not provide Michelle the due process and equal protection safeguards *Hop* requires because neither the regional center nor the developmental center changed Michelle's placement or any of her other services, and therefore neither Michelle nor George had the right to request a hearing under the administrative fair hearing procedures.[12]

Accordingly, the trial court may proceed with the pending *Hop* review hearing to determine whether Michelle's disabilities continue to justify her placement in a developmental center.  If the trial court determines Michelle's Fairview placement is no longer warranted because a less restrictive facility can meet her needs, George may request Michelle's transfer to a specific facility of his choosing and urge adoption of the services he believes are necessary.  The administrative fair hearing procedures should be used to resolve any challenge George has to the facility the regional center ultimately may select for Michelle and the services to be provided at that facility.  The trial court should not resolve any such challenges in the first instance during the *Hop* review, which is limited to deciding whether appropriate efforts have been made to identify a less

---

[12]     Because neither the Harbor Regional Center nor Fairview made any decision that would have allowed Michelle or George to invoke the administrative fair hearing procedures, we need not decide whether these administrative procedures would satisfy *Hop* if there were an administrative hearing before an independent hearing officer.

34

restrictive facility that satisfies all of Michelle's needs and whether at least one such facility exists. Assuming the trial court concludes Michelle should be transferred, she should not be transferred until all issues regarding her new placement are resolved. (See *Hop*, *supra*, 29 Cal.3d at p. 94 ["'A precipitous release of these [adults] to families and community facilities unprepared to care for them could be both disruptive to the treatment program and potentially harmful to the [patient] and the community'"]; see also *Sherry S.*, *supra*, 207 Cal.App.3d at p. 463.)

C.    *The Right to Independent Appointed Counsel Prevents a Conservator From Selecting the Conservatee's Counsel for the* Hop *Review*

George contends the trial court erred in refusing to substitute the attorney he hired to represent Michelle on the pending *Hop* petition for the court appointed Public Defender. We conclude the court did not err because Michelle's right to counsel on the *Hop* petition is a right to independent counsel appointed to protect her fundamental right to personal liberty. Because the Public Defender was appointed as independent counsel for Michelle, George may not replace the Public Defender with counsel of his choice even though he is Michelle's legal representative for most purposes.[13]

*Hop* found a developmental center placement constitutes a substantial deprivation of personal liberty and therefore a section 4825 committee is entitled to many of the same constitutional safeguards as a criminal defendant, including a judicial hearing to test the basis for the placement, a jury trial, application of the beyond a reasonable doubt standard of proof, and appointed counsel. (*Hop*, *supra*, 29 Cal.3d at pp. 89, 93-94.) Based on the fundamental liberty interest at stake, *Hop* requires these safeguards even

---

[13]    Our discussion focuses on Michelle's right to appointed counsel on the pending *Hop* petition rather than the section 4800 habeas corpus petition because, as explained above, we find the Public Defender lacked authority to pursue the habeas corpus petition and the suitability of Michelle's Fairview placement should be decided on the *Hop* petition. We therefore do not consider George's argument that Michelle's right to counsel is a statutory right as opposed to one arising under *Hop*.

though only a developmentally disabled person's parent or conservator may request a section 4825 developmental center placement. (§ 4825; *Violet C.*, *supra*, 213 Cal.App.3d at p. 92; *Sherry S.*, *supra*, 207 Cal.App.3d at p. 457.)

Although the *Hop* court presumed parents and conservators "'are well motivated and act in what they reasonably perceive to be the best interest of their children [or conservatees],'" the court concluded "[t]hat fact cannot . . . detract in any way from the child[ or conservatee's] right to procedures that will protect him from arbitrary curtailment of his liberty interest in such a drastic manner [as developmental center placement] no matter how well motivated.' [Citations.]" (*Hop*, *supra*, 29 Cal.3d at p. 93.) Indeed, "[n]o matter how well intentioned parents and conservators may be, they cannot exert their influence to curtail or deny the due process rights of persons with developmental disabilities." (*Capitol People*, *supra*, 155 Cal.App.4th at p. 699.)

"[U]nder the Lanterman Act it is the individual with a developmental disability—not his or her family, friends, or conservator—who is afforded all the legal rights and responsibilities guaranteed by the United States and California Constitutions." (*Capitol People*, *supra*, 155 Cal.App.4th at p. 699.) We may not substitute the good intentions of a developmentally disabled person's parent or conservator for the person's right to a hearing, appointed counsel, or any other constitutional safeguard *Hop* requires. (*Hop*, *supra*, 29 Cal.3d at p. 93.) We therefore conclude the right to appointed counsel under *Hop* is a right to independent counsel.

We find support for our conclusion in other cases that hold a person is entitled to independent counsel when his or her conservator or representative seeks to take an action that would significantly impact the person's fundamental rights. For example, in *Wendland v. Superior Court* (1996) 49 Cal.App.4th 44 (*Wendland*), the Court of Appeal found the trial court erred in refusing to appoint independent counsel for a conservatee. The conservatee's wife, acting as temporary conservator, petitioned the trial court to remove the conservatee's feeding tube because he suffered from severe

36

brain injuries, was mostly paralyzed, and could not communicate, although the conservatee was not in a persistent vegetative state. The conservatee's mother and sister opposed the petition and asked the trial court to appoint independent counsel for the conservatee. (*Id*. at pp. 46-47.) The trial court denied the request because it found the conservatee's mother and sister adequately represented his interests. (*Id*. at p. 48.)

In reversing that decision, the appellate court found the mother's and sister's opposition to the petition to remove the feeding tube did not necessarily mean they represented the conservatee's interests, and therefore the conservatee was entitled to an independent representative who would identify and advocate for the conservatee's interests. As the *Wendland* court explained, "[A] person facing the final accounting of death should not be required to rely on the uncertain beneficence of relatives. . . . [The conservatee's] mother and sister . . . do [not] necessarily represent his interests. [¶] . . . [¶] Because [the conservatee's] very life is at stake, he is entitled to counsel to represent his interests, whatever those interests might be." (*Id*. at p. 52; see also *Conservatorship of Sides* (1989) 211 Cal.App.3d 1086, 1092-1093 [proposed conservatee entitled to independent appointed counsel in proceeding to appoint conservator]; *In re David C.* (1984) 152 Cal.App.3d 1189, 1208 [child entitled to independent appointed counsel on county's petition to terminate child's parental rights].)

*Conservatorship of Drabick* (1988) 200 Cal.App.3d 185 (*Drabick*), also involved a conservator's petition to remove his conservatee's feeding tube, but the conservatee in *Drabick* was in a persistent vegetative state. (*Id*. at p. 189.) The trial court appointed independent counsel for the conservatee and the question on appeal was not whether independent counsel should have been appointed, but whether appointed counsel was required to oppose the petition. After conducting an independent investigation, the appointed counsel concluded removing the feeding tube was in the conservatee's best interest and therefore did not oppose the conservator's petition. The *Drabick* court held appointed counsel's role was to independently determine and

37

represent the conservatee's best interests regardless of whether those interests were consistent or inconsistent with the actions the conservator sought on the conservatee's behalf: "When an incompetent conservatee is still able to communicate with his attorney it is unclear whether the attorney must advocate the client's stated preferences—however unreasonable—or independently determine and advocate the client's best interests. [Citation.] When the client is permanently unconscious, however, the attorney must be guided by his own understanding of the client's best interests. There is simply nothing else the attorney can do." (*Id*. at pp. 212-213.)

Here, we are concerned with Michelle's fundamental right to personal liberty, which the *Hop* court found "'second only to life itself.'" (*Hop*, *supra*, 29 Cal.3d at p. 89.) Moreover, although Michelle is not permanently unconscious, the parties agree she is incompetent, cannot communicate her preferences to counsel, and cannot otherwise assist counsel in determining her best interests. Accordingly, we find Michelle's right to independent counsel analogous to the conservatees' right in *Wendland* and *Drabick*. We acknowledge the right to appointed counsel in *Wendland* and *Drabick* was statutorily created while the right to appointed counsel under *Hop* was judicially created. Nonetheless, the rationale and need for independent appointed counsel exists when a conservator or other representative proposes acts that would significantly affect the person's fundamental rights. (See *Conservatorship of David L.* (2008) 164 Cal.App.4th 701, 710 (*David L.*) [regardless of whether right to effective assistance of counsel is constitutional in nature, "once such a right has been conferred, a proposed conservatee has an interest in it which is protected by the due process clause of the Constitution"].)

Because we conclude Michelle's right to appointed counsel under *Hop* is the right to independent counsel, we also conclude George may not replace the court appointed Public Defender with private counsel. Allowing George to select Michelle's counsel for the *Hop* hearing would render her right to independent counsel meaningless because George simply could replace the Public Defender with counsel who would

38

follow George's instructions without independently evaluating whether those instructions are in Michelle's best interest. George assumes his decisions about Michelle's placement are necessarily in her best interest. His position leaves no room for good faith disagreement. As explained above, the purpose of independent counsel under *Hop* is to prevent the arbitrary curtailment of a developmentally disabled person's fundamental right to personal liberty by a parent or conservator pursuing placement on the developmentally disabled person's behalf. We do not suggest George is doing anything other than what he in good faith believes to be in Michelle's best interests, but his good faith and benevolent intentions cannot serve as a substitute for the constitutional safeguard independent appointed counsel provides.[14] (*Hop*, *supra*, 29 Cal.3d at p. 93.) Accordingly, we conclude the trial court did not err in refusing to substitute the attorney George hired for the Public Defender.

But we emphasize the limited scope and purpose of the *Hop* hearing and the appointment of counsel for that hearing. As Michelle's appointed counsel, the Public Defender does not become her counsel or representative for all purposes. Rather, the Public Defender represents Michelle solely to test whether her disabilities warrant placement in the most restrictive environment available under the Lanterman Act. The Public Defender must independently investigate Michelle's disabilities and her needs to determine whether they continue to require developmental center placement. The Public Defender is not required to oppose developmental center placement, but rather to identify and advocate for Michelle's best interests regardless of whether those interests require developmental center placement or placement in a less restrictive facility. (*Wendland*, *supra*, 49 Cal.App.4th at p. 52; *Drabick*, *supra*, 200 Cal.App.3d at pp. 212-214.) The

---

[14]     The evidence shows George and his family are devoted to Michelle and have sought continually to provide for her well-being. Their efforts no doubt reflect those of the great majority of conservators whose only motivation is to ensure their loved ones receive the best available care.

39

Public Defender does not have authority to make any decisions on Michelle's behalf; he merely evaluates whether her disabilities warrant keeping her at Fairview and presents that determination to the court. Moreover, the appointment of independent counsel does not mean George has no role in the process and may not participate in the *Hop* hearing. To the contrary, George remains Michelle's representative and he may continue to advocate for the placement he believes is best suited for Michelle. George lacks authority to control the Public Defender's actions, but he may voice his opposition to those actions.

George contends an attorney appointed to represent a developmentally disabled person under *Hop* is independent with the power to decide whether to advocate for or against developmental center placement only when (1) the developmentally disabled person has no other legal representative, or (2) a "legal conflict" exists between the developmentally disabled person and his or her legal representative. According to George, Michelle does not require independent counsel, and the Public Defender must follow his instructions, because the court order appointing him as Michelle's limited conservator makes him her legal representative and he has no legal conflict with Michelle. This argument fails for two reasons.

First, Michelle's right to and the authority of her independent counsel under *Hop* do not depend on the absence of any other legal representative for Michelle. The conservatees in *Wendland* and *Drabick* both had an appointed conservator acting as a legal representative, but the conservatees nonetheless had a right to independent appointed counsel who was not required to follow the appointed conservator's directives. (*Wendland*, *supra*, 49 Cal.App.4th at pp. 47-48, 52; *Drabick*, *supra*, 200 Cal.App.3d at pp. 189, 212-214.) Moreover, placement in a developmental center under section 4825 may only be sought by a developmentally disabled person's legal representative (§ 4825; *Violet C.*, *supra*, 213 Cal.App.3d at p. 92; *Sherry S.*, *supra*, 207 Cal.App.3d at p. 457), and therefore accepting George's contention would mean a developmentally disabled

40

person would never have a right to independent appointed counsel under *Hop*. Michelle's right to independent counsel, however, arises from the significance of the interest at stake on the *Hop* petition—Michelle's fundamental right to personal liberty— not from the absence of a legal representative for Michelle.

Second, George provides no explanation or authority to support his conclusion he has no legal conflict with Michelle. *Hop* bases the right to appointed counsel and the other constitutional safeguards it requires on the inherent conflict that arises when a parent or conservator seeks developmental center placement for a developmentally disabled person. Because the placement has a significant impact on the developmentally disabled person's fundamental right to personal liberty, *Hop* requires constitutional safeguards to ensure the developmentally disabled person's disabilities justify the placement. Whether there is an actual conflict between the developmentally disabled person and the parent or conservator seeking the placement cannot be determined until the court determines whether the placement is justified (if the placement is justified, there is no actual conflict). To require an actual conflict before granting a developmentally disabled person the right to independent counsel would render the right illusory. That is clearly not *Hop*'s intent.

George also argues he may exercise Michelle's absolute right to replace her counsel at any time because he is Michelle's legal representative with the power to fix her residence, give or withhold medical consent, and contract on Michelle's behalf. As a general rule, a client has the right to replace his or her attorney at virtually any time with or without cause. (*People v. Ortiz* (1990) 51 Cal.3d 975, 983; *People v. Courts* (1985) 37 Cal.3d 784, 789-790 [criminal defendant may replace his or her appointed counsel with new, retained counsel at any time]; *Fracasse v. Brent* (1972) 6 Cal.3d 784, 790.) These rules, however, do not support George's position. Although George is Michelle's legal representative and the holder of her attorney-client privilege (Evid. Code, § 953), Michelle remains the client (Evid. Code, § 951). George does not cite any authority

41

allowing a conservator to replace a conservatee's court appointed independent counsel with counsel the conservator selected. As explained above, allowing a conservator to do so would render the right to independent appointed counsel meaningless.

Finally, George contends *Drabick* requires the Public Defender to follow his instructions. It does not. In *Drabick*, the Court of Appeal held a conservator must have the power to exercise a comatose conservatee's right to refuse medical treatment and not have his or her life artificially extended because the right would be rendered meaningless if someone could not exercise it on the comatose conservatee's behalf. (*Drabick*, *supra*, 200 Cal.App.3d at pp. 208-210.) The *Drabick* court, however, did not conclude the conservatee's appointed counsel must follow the conservator's instructions. To the contrary, the court held appointed counsel must independently determine and advocate for the conservatee's best interests regardless of whether those interests coincide with the conservator's course of action on the conservatee's behalf. (*Id*. at pp. 212-214.) As explained above, independent appointed counsel provides an important check and balance against a conservator's efforts to take action on an incompetent conservatee's behalf that would significantly affect the conservatee's fundamental rights. Appointed counsel does not exercise the right for the conservatee or veto the conservator's exercise of the right for the conservatee; rather, appointed counsel provides an independent view of what is in the conservatee's best interest. Here, the trial court ultimately will decide whether Michelle's Fairview placement remains warranted based on all of the information received from George, the Public Defender, the Harbor Regional Center, and any other interested parties.

D.    *A Conservator May Seek New Appointed Counsel for the* Hop *Petition If He Believes the Public Defender Is Not Providing Effective Representation*

Our conclusion George may not replace Michelle's appointed counsel with counsel of his choice does not mean George is powerless to challenge the adequacy of the Public Defender's representation. Michelle's right to appointed counsel is a right to

42

effective counsel, and the trial court must provide George, as Michelle's legal representative, a full opportunity to request new appointed counsel for her if he believes the Public Defender is not providing Michelle effective assistance. (See *David L.*, *supra*, 164 Cal.App.4th at pp. 705-706.)

In *David L.*, the public guardian filed a petition to appoint an LPS conservator for a prospective conservatee and the trial court appointed the public defender to represent the prospective conservatee. On the third day of the trial to determine whether the prospective conservatee was gravely disabled and in need of a conservator, the public defender advised the court the prospective conservatee "was 'suffering from extreme anxiety, stomach issues, and he can't come to court.'" The public defender further advised the prospective conservatee wanted another appointed lawyer because he believed the public defender was not adequately representing him, but the public defender could not provide any further explanation. The trial court denied the request, proceeded with the trial in the prospective conservatee's absence, found the prospective conservatee gravely disabled, and appointed an LPS conservator. (*David L.*, *supra*, 164 Cal.App.4th at pp. 706-708.) The Court of Appeal concluded the trial court violated the prospective conservatee's due process rights because he "was not given a full opportunity to state his reasons for requesting substitute counsel, and thus, was not afforded due process in the determination of his request for substitute counsel." (*Id.* at p. 712.)

The *David L.* court explained that the statutory or constitutional right to appointed counsel necessarily includes the right to effective counsel under the Constitution's due process clause. Moreover, because of the significant liberty interest at stake in an LPS conservatorship proceeding and the confinement in a locked treatment facility that may result from the proceeding, a prospective conservatee is entitled to many of the same due process protections as a criminal defendant, including the right to seek new appointed counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), if the

43

prospective conservatee believes her appointed counsel is not providing effective representation.  (*David L.*, *supra*, 164 Cal.App.4th at pp. 710-711.)

In *Marsden*, the Supreme Court held trial courts must provide criminal defendants seeking to change appointed counsel an opportunity to state the reasons for their request because ""'"[t]he right of a defendant in a criminal case to have the assistance of counsel for his defense . . . may include the right to have counsel appointed by the court . . . discharged or other counsel substituted, if it is shown . . . that failure to do so would substantially impair or deny the right . . . ."'"  [Citations.]"  (*Marsden*, *supra*, 2 Cal.3d at pp. 123-124; *David L.*, *supra*, 164 Cal.App.4th at p. 709.)  The *Marsden* court explained, "A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request.  The defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are not apparent to the trial judge from observations within the four corners of the courtroom. . . .  A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.'  [Citation.]"  (*Marsden*, at pp. 123-124; *David L.*, at p. 711.)

The *David L.* court found "no meaningful distinction between criminal and LPS proceedings insofar as the procedures required to guard against the erroneous deprivation of the right to effective assistance of counsel," and therefore "conclude[d] that the trial court must afford a prospective conservatee a full opportunity to state the reasons for requesting substitute counsel in accordance with *Marsden*."  (*David L.*, *supra*, 164 Cal.App.4th at p. 711.)  The trial court erred by failing to do so.

In *Hop*, the Supreme Court found a section 4825 placement of a developmentally disabled person in a state developmental center was analogous to a prospective conservatee under the LPS Act and therefore the developmentally disabled person was "entitled to the same congeries of rights" as a prospective LPS conservatee.

44

(*Hop*, *supra*, 29 Cal.3d at p. 93.)  Consequently, we conclude the trial court in a *Hop* review must afford a developmentally disabled person a full opportunity to request new appointed counsel and to state the reasons for that request under the procedures established in *Marsden*.

Here, the parties agree Michelle is incompetent and unable to personally exercise her right to request new appointed counsel.  That inability, however, does not mean Michelle is any less entitled to effective representation or any less entitled to request new appointed counsel if the representation she is receiving is ineffective.  "[I]ncompetence does not cause the loss of a fundamental right from which the incompetent person can still benefit."  (*Drabick*, *supra*, 200 Cal.App.3d at p. 208.)  Indeed, in enacting the Lanterman Act the Legislature declared, "Persons with developmental disabilities have the same legal rights and responsibilities guaranteed all other individuals by the United States Constitution and laws and the Constitution and laws of the State of California."  (§ 4502; see also *Hop*, *supra*, 29 Cal.3d at p. 89 ["persons will not be deprived of due process or equal protection of law on the basis of developmental disability alone"].)

Accordingly, we conclude George, as Michelle's legal representative with the power to fix her residence, provide or withhold medical consent, and contract on her behalf, may exercise Michelle's right to request new appointed counsel if he believes the Public Defender is not providing effective representation.  Michelle's right to effective counsel and to request new appointed counsel would be meaningless unless someone is permitted to exercise the right for her.  (See *Drabick*, supra, 200 Cal.App.3d at p. 209.)  We acknowledge George did not seek to exercise Michelle's right to request new appointed counsel, but rather sought to substitute new, private counsel he retained for Michelle in place of the Public Defender.  As explained above, George may not do so.  But in connection with the trial court's *Hop* review of Michelle's Fairview placement, the trial court must allow George to request new appointed counsel if he believes the Public

45

Defender is providing Michelle ineffective representation and must provide George a full opportunity to state the reasons for the request under *Marsden*.[15]  We express no opinion on whether the Public Defender has adequately represented Michelle.

IV

DISPOSITION

The petition is granted in part and denied in part.  Let a writ of mandate issue directing the trial court to (1) enter an order dismissing the habeas corpus petition; (2) conduct a hearing on the *Hop* petition; and (3) hear and decide any request to appoint new counsel for Michelle.  Our order staying all trial court proceedings on the habeas corpus and *Hop* petitions is hereby dissolved.  In the interest of justice, all parties shall bear their own costs on this writ proceeding.


ARONSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


FYBEL, J.

---

[15]  George argues *Marsden* does not apply based on his contention he had the right to replace the Public Defender with private counsel of his choice.  George is correct *Marsden* does not apply when a criminal defendant seeks to replace appointed counsel with retained counsel.  (*In re V.V.* (2010) 188 Cal.App.4th 392, 398.)  As explained above, however, George's only option is to ask for new appointed counsel for Michelle; he may not replace the Public Defender with retained counsel.  In that situation, George concedes *Marsden* applies.