Filed 4/28/16  In re Michelle K. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re MICHELLE K., a Developmentally Disabled Person. | |
| HARBOR DEVELOPMENTAL DISABILITIES FOUNDATION, etc., | G051177 |
| Petitioner and Respondent, | (Super. Ct. No. A169658) |
| v. | O P I N I O N |
| GEORGE K., | |
| Objector and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Gerald G. Johnston, Judge.  Affirmed.

Locke Lord, Jon L. Rewinski and Matthew B. Nazareth for Objector and Appellant.

Enright & Ocheltree, Judith A. Enright, Julie A. Ocheltree and Noelle V. Bensussen for Petitioner and Respondent.

Suzanne Davidson, under appointment by Court of Appeal, for Michelle K.

*          *          *

Michelle K.[1] is a 54-year-old, developmentally disabled person who has resided at Fairview Developmental Center (Fairview) for more than 40 years. Since the early 1990's, the trial court has authorized Michelle's Fairview residence based on a series of placements under the Lanterman Developmental Disabilities Services Act (Lanterman Act; Welf. & Inst. Code, § 4500 et seq.).[2] The Harbor Regional Center initiated each of these placements by petitioning for court approval, and Michelle's conservator, George K., supported the ongoing placement. This is the second time we have been called upon to determine whether the trial court periodically must review whether to continue Michelle's ongoing placement at Fairview.

In our previous opinion, we concluded Michelle had a due process right to periodic judicial review of her Fairview placement because confinement in a state developmental center, which is the most restrictive environment available under the Lanterman Act, constitutes a significant restraint on her personal liberty. We also concluded Michelle's equal protection rights required periodic judicial review because other adults placed in similar protective custody under other statutory schemes have the right to periodic judicial review of their confinement. We therefore issued a writ of mandate directing the trial court to conduct a hearing on the Harbor Regional Center's most recent petition seeking court approval of Michelle's ongoing Fairview placement.

---

[1]     For privacy reasons, we abbreviate the last name of Michelle and her family members, and will use only their first names. (See Welf. & Inst. Code, § 4502, subd. (b); *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008, fn. 1.) No disrespect in intended.

[2]     All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

On remand, however, the Harbor Regional Center requested to dismiss its petition before the trial court conducted a hearing. The Harbor Regional Center explained since it originally filed the petition over three years earlier it had determined a less restrictive placement could meet Michelle's needs. George opposed the dismissal because he believed Fairview remained the least restrictive facility capable of caring for Michelle, and the Harbor Regional Center had not identified another specific facility capable of doing so. Finding Michelle's Fairview placement could not be maintained without the Harbor Regional Center's approval, the trial court granted the dismissal request and George appealed.

We affirm. Our previous opinion required judicial review for the limited purpose of determining whether Michelle's disabilities continued to justify the restraint on her personal liberty inherent in her ongoing developmental center placement. As a constitutional safeguard, we required an independent judicial review to ensure the statutory scheme authorizing the ongoing placement did not allow the Harbor Regional Center and George to indefinitely confine Michelle in Fairview.

After the Harbor Regional Center withdrew its support for Michelle's ongoing placement at Fairview, however, judicial review no longer was necessary because the Lanterman Act does not permit Michelle to remain at Fairview without the Harbor Regional Center's approval. The Harbor Regional Center's decision to withdraw its placement petition transformed this matter from an independent review of the ongoing placement's constitutionality into a dispute between George and the Harbor Regional Center over the least restrictive placement capable of meeting Michelle's needs.

It is well established the Lanterman Act's administrative fair hearing process provides the exclusive forum for resolving a dispute over whether a developmentally disabled person should remain in a development center or transition into a less restrictive community-based facility. Judicial review may be sought only after the parties have exhausted their administrative remedies. Our earlier decision did nothing to

3

change this basic rule. The nature and purpose of the periodic judicial review we required to ensure the constitutionality of Michelle's placement differs greatly from the dispute resolution hearing under the fair hearing process.

George therefore must invoke the fair hearing process to challenge the Harbor Regional Center's decision to transfer Michelle to a specific community-based facility, and he may obtain judicial review only after that process has run its course. To minimize the impact on Michelle, she may not be transferred until the issues concerning her placement are resolved and all services and supports she requires are in place at the new facility.

I

FACTS AND PROCEDURAL HISTORY

Michelle is a 54-year old, developmentally disabled adult with an estimated IQ of less than 23. She has been diagnosed with autistic disorder and other severe intellectual disabilities. Michelle is minimally verbal with limited ability to comprehend others. She is ambulatory, but she cannot self-administer the many daily medications she requires, nor can she provide for her basic personal needs such as food, shelter, and clothing. For her own safety, Michelle requires regular supervision because she cannot appreciate basic safety hazards and lacks sufficient knowledge to independently access community facilities and services.

Based on Michelle's developmental disabilities, her parents admitted her to Fairview at the age of 10. In August 1987, the trial court appointed George and Michelle's aunt, Coula, as Michelle's limited conservators under the Probate Code. The court granted George and Coula the power "[t]o fix the residence or specific dwelling of [Michelle], except at Fairview State Hospital absent court approval," give or withhold medical consent, and contract on Michelle's behalf. The court has investigated and

4

reviewed this limited conservatorship every two years, but has not found any grounds to modify or terminate it.

Since 1993 the trial court has annually reviewed the suitability of Michelle's Fairview placement under *In re Hop* (1981) 29 Cal.3d 82 (*Hop*) and section 4825. The Harbor Regional Center initiated each of these annual "*Hop* reviews" by requesting court approval for Michelle to remain at Fairview. Each time the court conducted a *Hop* review, it appointed the Orange County Public Defender (Public Defender) to serve as Michelle's attorney and ultimately approved Michelle's continued placement at Fairview subject to "further judicial review within one (1) year."

The Harbor Regional Center filed its most recent "*Hop* petition" in January 2011, explaining "there is no known suitable, legally available placement [for Michelle] that is less restrictive than the proposed state developmental center placement." In November 2012, while that petition remained pending, the Public Defender filed a habeas corpus petition on Michelle's behalf, alleging Michelle's ongoing Fairview placement unlawfully restrained her personal liberty because it was not the least restrictive placement capable of meeting her needs.

In response, George filed a petition for writ of mandate or prohibition to prevent the trial court from deciding either the habeas corpus petition or the *Hop* petition. George urged us to dismiss both petitions because the Public Defender lacked authority to file the habeas corpus petition on Michelle's behalf and the trial court lacked jurisdiction under *Hop* to review Michelle's ongoing Fairview placement. According to George, Michelle's Fairview placement should have been determined through the Lanterman Act's administrative fair hearing process, not in court. In a published opinion, we granted George's writ petition in part and denied it in part, "directing the trial court to (1) enter an order dismissing the habeas corpus petition; [and] (2) conduct a hearing on

5

the *Hop* petition."[3]  (*Michelle K. v. Superior Court* (2013) 221 Cal.App.4th 409, 452 (*Michelle K.*).)

On remand, the trial court dismissed the Public Defender's habeas corpus petition and scheduled the Harbor Regional Center's *Hop* petition for trial.  A few weeks before the trial date, George filed a "Notice of Joinder of *Hop* Petition" stating he "join[ed] in the currently pending Petition for Renewal of State Developmental Center Placement (*In re Hop*/W&I §4825) filed by Harbor Regional Center."  Later that same day, the Harbor Regional Center filed a "Motion for Withdrawal of *Hop* Petition," seeking an order allowing it to withdraw the pending *Hop* petition and vacating the trial date on the petition.  The motion explained, "the petition was filed [over three and one-half years earlier] and the relief requested in the petition is no longer appropriate and [the Harbor Regional Center] is no longer seeking placement in a state developmental center." The Harbor Regional Center argued it had the right to dismiss the action under Code of Civil Procedure section 581 because it was the party who initiated the proceedings, it was the only one with authority to keep Michelle at Fairview, and the hearing on the petition had not yet commenced.  In seeking to dismiss the *Hop* petition, the Harbor Regional Center did not identify a specific facility to which it intended to transfer Michelle nor did it seek an order changing Michelle's placement.

George opposed the Harbor Regional Center's motion, arguing the trial court had jurisdiction to review Michelle's ongoing Fairview placement despite the Harbor Regional Center's motion to withdraw its *Hop* petition because George, as Michelle's conservator with the authority to fix her residence, believed Fairview was the

---

[3]  We also directed the trial court to "hear and decide any request to appoint new counsel for Michelle" because George argued the Public Defender was not acting in Michelle's best interests.  (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 452.)  That aspect of our earlier decision is not at issue in this appeal.

6

least restrictive placement that met Michelle's needs. George also argued his joinder in the *Hop* petition prevented the Harbor Regional Center from dismissing the petition.

The trial court granted the Harbor Regional Center's motion and dismissed the *Hop* petition, explaining, "In the absence of any authority indicating Code of Civil Procedure section 581(b) does not apply to *Hop* petitions, the Court finds this section applicable. Joinder filed by Opposing party does not confer to that person authority which is statutorily reserved for the regional center regarding placement. Opposing party retains the ability for meaningful participation in any placement decision proposed by Harbor Regional Center through the administrative fair hearing process." The court also emphasized that the question of which placement was most appropriate for Michelle was not ripe for judicial review because no final determination had been made and the administrative process had not been exhausted.

George appealed from the order dismissing the *Hop* petition and related proceedings.[4]

---

[4] Although an order dismissing an action or special proceeding under Code of Civil Procedure section 581, subdivision (b)(1), generally is not appealable, none of the parties question whether we properly may hear George's appeal. We nonetheless conclude it is appropriate to address the issues presented by the trial court's order because George's appeal presents questions of law we review de novo and the nature of the proceedings relating to judicial review of a developmentally disabled person's ongoing placement at a state developmental center render the issues capable of recurring, yet evading review. (See *Conservatorship of Martha P.* (2004) 117 Cal.App.4th 857, 865, fn. 5.) Indeed, the ability of these issues to recur and evade review is demonstrated by the existence of two additional appeals currently pending before this court that challenge a trial court order dismissing a *Hop* petition under Code of Civil Procedure section 581, subdivision (b)(1). (See *In re Donna P.* (April 28, 2016, G050750) [nonpub. opn.]; *In re John C.* (April 28, 2016, G051189 [nonpub. opn.].)

7

II

DISCUSSION

A.    *The Lanterman Act and State Developmental Center Placements*

The Lanterman Act "'grants persons with developmental disabilities the right to receive treatment and services to meet their needs, regardless of age or degree of handicap, at each stage of life.'" (*In re Michael K.* (2010) 185 Cal.App.4th 1112, 1117 (*Michael K.*).)  "The Legislature enacted the Lanterman Act to 'establish certain rights of the so-called developmentally disabled persons, primarily their entitlement to the maximum degree of personal liberty and autonomy consonant with their handicap.'" (*Ibid.*)  "These [rights] include the 'right to treatment and habilitation services and supports in the least restrictive environment' and the 'right to dignity, privacy, and humane care,' with treatment, services and supports provided in natural community settings to the maximum extent possible." (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 682 (*Capitol People*).)

"A '"[d]evelopmental disability"' is 'a disability that originates before an individual attains age 18 years, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual.' (§ 4512, subd. (a).)  The term includes 'mental retardation, cerebral palsy, epilepsy, and autism,' but does not include 'other handicapping conditions that are solely physical in nature.' (*Ibid.*)" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422.)

"The state contracts with private nonprofit corporations to establish and operate a network of 21 regional centers [including the Harbor Regional Center] that are responsible for determining eligibility, assessing needs, and coordinating and delivering direct services to developmentally disabled persons and their families.  [Citation.]  The regional centers' purpose is to 'assist persons with developmental disabilities and their families in securing those services and supports which maximize opportunities and

8

choices for living, working, learning, and recreating in the community.' [Citation.] The state 'allocates funds to the centers for operations and the purchasing of services, including funding to purchase community-based services and supports.'" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422.)

"'The specific rights of persons with developmental disabilities and the corresponding obligations of the state are determined through an individual program plan (IPP) procedure that meets common statutory requirements. (§§ 4646-4648.) The IPP is developed by a planning team that includes the [developmentally disabled person], his or her legally authorized representative, and one or more regional center representatives. (§ 4512, subd. (j).) The goals and objectives developed through the IPP process should maximize opportunities for the individual to be part of community life; enjoy increased control over his or her life; acquire positive roles in community life; and develop the skills to accomplish the same. (§ 4646.5, subd. (a)(2).)'" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422.) The developmentally disabled person and his or her conservator or representative are statutorily guaranteed "the opportunity to actively participate in the development of the [IPP]." (§ 4646, subd. (b).)

"Before July 1, 2012, a nondangerous, developmentally disabled person could be admitted to a state developmental center in two ways. First, the person could submit a written admission application if he or she 'is in such condition of mind as to render him competent to make [the application].' (§ 6000, subd. (a)(1).) Second, section 4825 authorized admission 'upon the application of the person's parent or conservator in accordance with the provisions of Sections 4653 and 4803.' (See § 6000.5.) Section 4653 states 'no developmentally disabled person shall be admitted to a state hospital except upon the referral of a regional center.' Section 4803 provides that a regional center may not recommend admission of a developmentally disabled person to a community care or health facility unless the regional center certifies the person to be admitted or the person's parent or conservator does not object. Section 4825 does not

9

limit the length of a developmentally disabled person's commitment, nor does it require judicial review of the placement." (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 422-423.)

"Effective July 1, 2012, the Legislature amended the Welfare and Institutions Code to prohibit nondangerous, developmentally disabled persons from being admitted to state developmental centers. (§§ 4507, 7505.) Section 7505 now provides that a person shall *not* be admitted to a state developmental center unless the person is developmentally disabled *and* the person is (1) committed by a court to Fairview Developmental Center because the person is a danger to self or others under section 6500 and is suffering an acute crisis as defined in section 4418.7; (2) committed by a court to the Porterville Developmental Center's secure treatment program through the criminal justice system or juvenile court system; or (3) a prior resident of a developmental center who was provisionally released no more than 12 months earlier." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 423.)

"These recent Welfare and Institutions Code amendments do not require moving nondangerous, developmentally disabled persons living in a state developmental center on July 1, 2012, to a different facility. Instead, the amendments require the regional center responsible for the committee to conduct a comprehensive assessment and 'identify the types of community-based services and supports available to the [person].' (§ 4418.25, subd. (c)(2)(A) & (B).) The regional center must then provide the assessment to the individual program planning team to assist it in determining the least restrictive environment for the committee. (§ 4418.25, subd. (c)(2)(D).)" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 423.) The Legislature required the regional center to complete this assessment by December 31, 2015 (§ 4418.25, subd. (c)(2)(C)), and the assessment must be "updated annually as part of the individual program planning process for as long as the [developmentally disabled person] resides in the developmental center" (§ 4418.25, subd. (c)(2)(E)). When a community-based placement is identified and selected, all necessary services and supports must be in place before transferring a nondangerous,

10

developmentally disabled person from a developmental center to the community-based living arrangement.  (§ 4418.3, subd. (a).)

"[T]he Lanterman Act guarantees an applicant for or recipient of services or his or her representative 'who is dissatisfied with any decision or action of [a regional center]' the right to an administrative fair hearing.  (§ 4710.5, subd. (a).)  The statute also provides detailed provisions for claimants who wish to attempt to resolve the issue through a voluntary informal meeting or through voluntary mediation before proceeding to an administrative fair hearing.  (§§ 4710.5, subd. (a); 4710.6, subds. (a), (b); 4710.7; 4710.8; 4710.9; 4711.5.)"  (*Conservatorship of Whitley* (2007) 155 Cal.App.4th 1447, 1459-1460 (*Whitley*).)

"The [Department of Developmental Services] is required to 'contract for the provision of independent hearing officers' to conduct the hearing.  (§ 4712, subd. (b).)  The hearing officer is required to have special training in the law applicable to the developmentally disabled and the services available to them and the law of administrative hearings.  (§§ 4710.5, subd. (a); 4712, subd. (b).)  The agency awarding the contract for independent hearing officers 'shall biennially conduct, or cause to be conducted, an evaluation of the hearing officers who conduct' administrative fair hearings.  (§ 4712, subd. (n).)"  (*Whitley*, *supra*, 155 Cal.App.4th at p. 1460.)

The Lanterman Act guarantees the claimant a prehearing exchange of potential witnesses and documentary evidence, the opportunity to present witnesses and evidence, the opportunity to cross-examine witnesses, the right to appear through counsel or other representatives, and the right of access to records.  (*Whitley*, *supra*, 155 Cal.App.4th at p. 1460; see *Michelle K.*, *supra*, 221 Cal.App.4th at p. 424.)  Absent a showing of good cause, the regional center presents its witnesses and all other evidence first followed by the claimant's presentation of his or her case.  (§ 4712, subd. (j); *Whitley*, at p. 1460.)  A recording of the proceedings must be made at public expense. (§ 4712, subd. (k); *Whitley*, at p. 1460.)

11

"Within 10 working days of the fair hearing, the hearing officer must 'render a written decision' containing 'a summary of the facts, a statement of the evidence from the proceedings that was relied upon, a decision on each of the issues presented, and an identification of the statutes, regulations, and policies supporting the decision.' (§ 4712.5, subds. (a) & (b).)" (*Whitley*, *supra*, 155 Cal.App.4th at pp. 1460-1461.) "Either side may seek judicial review of the administrative decision through a writ of administrative mandamus." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 424.)

In *Hop*, the Supreme Court examined the constitutionality of section 4825, which was the Lanterman Act provision that previously allowed a developmentally disabled person to be indefinitely confined in a state developmental center based on a request by the person's parent or conservator, a recommendation by a regional center, and the absence of any objection from the person or the person's representative. (*Hop*, *supra*, 29 Cal.3d at pp. 87-88; *Michelle K.*, *supra*, 221 Cal.App.4th at pp. 426-427.) The *Hop* court explained personal liberty is a fundamental right both the United States and California Constitutions guarantee to all individuals, including developmentally disabled individuals, and placing a person in a developmental center is a significant restraint on the person's liberty interests because it is essentially a civil confinement. This restraint therefore required application of criminal due process standards to test the confinement's validity, including a judicial hearing to determine whether the person's disabilities warranted the confinement. (*Hop*, at pp. 89, 92; *Michelle K.*, at p. 427.)

The *Hop* court also concluded a developmentally disabled person's equal protection rights required a judicial hearing before confining the person in a state development center under section 4825. No other similarly situated adult in need of protective custody lawfully could be placed in a developmental center without a judicial determination the placement was appropriate, including proposed conservatees under the Lanterman-Petris-Short Act (LPS Act; § 5000 et seq.) and proposed committees under

12

section 6500 et seq., both of whom have a statutory right to judicial review before being confined in a developmental center. (*Hop*, *supra*, 29 Cal.3d at pp. 92-94; *Michelle K.*, *supra*, 221 Cal.App.4th at p. 428.) The *Hop* court therefore imposed *preconfinement* judicial review as a constitutional safeguard to ensure section 4825 placement in a developmental center did not deprive a developmentally disabled person of his or her personal liberty without due process and equal protection of the laws. This review includes the right to a jury trial on demand, application of the beyond reasonable doubt standard of proof, and the right to appointed counsel. (*Hop*, at pp. 93-94; *Michelle K.*, at p. 428.) Without this review, the Supreme Court explained placement under section 4825 would be unconstitutional. (*Michelle K.*, at p. 428.)

In *Michelle K.*, we concluded a developmentally disabled person's fundamental right to personal liberty also required periodic judicial review of an *ongoing* section 4825 developmental center placement to ensure the person's disabilities continued to warrant the placement. We explained, "The impairment of the committee's personal liberty is not diminished by residing in the developmental center for an extended period of time, especially when there are continuing advancements in both the treatment of numerous disabilities and the availability of less restrictive services in community-based and other facilities. No other class of similarly situated adults may lawfully remain in a state developmental center indefinitely without further judicial review of their ongoing placement. For example, the LPS Act and section 6500 et seq. place limits on the length of confinement for a gravely disabled person or a person believed to be a danger to self or others, and both statutory schemes also require judicial review to recommit the person or extend the initial confinement. [Citations.] [¶] The Lanterman Act does not limit the length of a section 4825 placement or require judicial review of the placement. Accordingly, unless *Hop* requires a further judicial review of a section 4825 placement, Michelle and others similarly situated could face a lifetime placement in a developmental center based solely on an initial judicial determination regarding the

13

placement's suitability. . . . That result is simply inconsistent with the constitutional principles articulated in *Hop*." (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 438-439.)

We emphasized periodic *Hop* reviews are limited to determining whether the developmentally disabled person's disabilities continue to justify the restraints on the person's fundamental liberty interests that are inherent in a state developmental center placement. (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 443.) The jurisdiction to conduct these reviews "does not confer or create jurisdiction to monitor the ongoing placement or make decisions regarding the details of the services the developmentally disabled person receives." (*Id.* at p. 441.)

B.       Michelle K. *Did Not Require the Trial Court to Review Michelle's Ongoing Fairview Placement After the Harbor Regional Center Dismissed Its* Hop *Petition*

George contends *Michelle K.* required the trial court to conduct a periodic *Hop* review of Michelle's ongoing Fairview placement even after the Harbor Regional Center withdrew its *Hop* petition and no longer supported that placement. According to George, *Michelle K.* established that all developmentally disabled persons have a constitutional right to periodic judicial review of their placement in a state developmental center while confined there. George misconstrues *Michelle K.* and the statutory scheme governing developmental center placement under the Lanterman Act.

*Michelle K.* did not establish a constitutional right to judicial review of the services and supports a developmentally disabled person receives under the Lanterman Act. Rather, *Michelle K.* requires periodic judicial reviews for the limited purpose of determining whether a developmentally disabled person's disabilities continue to justify the restraint on personal liberty inherent in a placement at the most restrictive facility available under the Lanterman Act. (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 441-442.) As we explained, the purpose of periodic *Hop* reviews is to ensure a developmentally disabled person's representative, a regional center, and a developmental center do not unconstitutionally deprive the person of his or her liberty by keeping the

14

person indefinitely confined in a developmental center without any independent review. (*Michelle K.*, at p. 443.) The periodic judicial review *Hop* and *Michelle K.* require is a constitutional safeguard designed to render an otherwise unconstitutional statutory scheme constitutional; it is not a procedural mechanism to help a developmentally disabled person enforce his or her right to receive certain services and supports under the Lanterman Act. (*Michelle K.*, at pp. 428, 441; see *Hop*, *supra*, 29 Cal.3d at pp. 92-94; *Michael K.*, *supra*, 185 Cal.App.4th at 1128, quoting *In re Borgogna* (1981) 121 Cal.App.3d 937, 946 ["*Hop* does not address the issue 'where the [regional] center seeks to deescalate or make less restrictive the placement, but the ward opposes such a transfer'"].)

Once the Harbor Regional Center withdrew its support for Michelle's placement at Fairview, *Hop* and *Michelle K.* no longer required judicial review to ensure Michelle's disabilities justified her ongoing confinement in a state developmental center because Michelle may not remain at Fairview without the Harbor Regional Center's approval. As explained above, the Harbor Regional Center is responsible for determining Michelle's eligibility to receive Lanterman Act services and supports, assessing her needs, and coordinating and delivering her services and supports. (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 422; *Capitol People*, *supra*, 155 Cal.App.4th at pp. 682-683.) Michelle could not be admitted to Fairview without the Harbor Regional Center's approval, nor could her admission be renewed without its approval. (See § 4653; *Hop*, *supra*, 29 Cal.3d at p. 87; *Michelle K.*, at pp. 423, 426-427.)[5]

---

[5] Because section 4653 states "no developmentally disabled person shall be *admitted* to a state hospital except upon the referral of a regional center" (italics added), George contends the section only applied to Michelle's initial admission to Fairview, and therefore he may maintain Michelle's Fairview placement without the Harbor Regional Center's approval. George cites no authority to support this contention, and ignores the Harbor Regional Center's responsibilities to determine eligibility, assess needs, and coordinate and deliver services and supports. Moreover, George overlooks that Michelle has remained at Fairview based on a series of court orders authorizing placement for one

15

Although George contends the trial court must review Michelle's Fairview placement because he believes it is the least restrictive placement capable of meeting her needs, he lacks the authority to keep her at Fairview without the Harbor Regional Center's approval, and therefore a periodic *Hop* review is unnecessary. He relies on his authority as Michelle's limited conservator to fix her residence, but he was appointed her conservator under the Probate Code, and Probate Code conservators lack the authority to place a conservatee in a state developmental center without court approval.[6] (See *Michelle K.*, *supra*, 221 Cal.App.4th at pp. 425, fn. 3, 429, *People v. Karriker* (2007) 149 Cal.App.4th 763, 779-780.) In recognition of this limitation, the court order appointing George expressly excludes the authority to fix Michelle's residence at Fairview unless court approval is obtained. George also points to his statutory right as Michelle's conservator to actively participate in the individual program planning process required to identify the services and supports the Harbor Regional Center will provide or arrange for Michelle. (See § 4646, subd. (b).) That right of participation, however, merely ensures George has the opportunity to provide input regarding Michelle's placement; it does not allow him to override the Harbor Regional Center's placement determination reached through the individual program planning process. (See *Capitol People*, *supra*, 155 Cal.App.4th at pp. 698-699 ["while the Lanterman Act does demonstrate an intent to include family members and conservators in the decisionmaking

---

year subject to further court approval. Each time the Harbor Regional Center applied for court approval it therefore was essentially a new placement. (See *Michelle K.*, *supra*, 221 Cal.App.4th at pp. 437-438.)

[6] Prior to July 1, 2012, a conservator appointed under the LPS had authority to place a conservatee in a state developmental center or other locked treatment facility if the conservator determined it was the least restrictive placement. (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 425.) The 2012 amendments to the Welfare and Institutions Code withdrew that authority. (*Ibid.*)

16

process affecting persons with disabilities [citations], it provides them scant concrete rights"].)

The Harbor Regional Center's withdrawal of its *Hop* petition and support for Michelle's ongoing Fairview placement therefore transformed this matter from an independent review to ensure the placement's constitutionality into a dispute between George and the Harbor Regional Center about which specific facility provides the least restrictive placement capable of meeting Michelle's needs. That dispute is not the proper subject of a periodic *Hop* review. (See *Michelle K.*, *supra*, 221 Cal.App.4th at p. 444 [periodic *Hop* review "is limited to deciding whether appropriate efforts have been made to identify a less restrictive facility that satisfies all of Michelle's needs and whether at least one such facility exists"].)

The Lanterman Act's "fair hearing procedures provide the exclusive remedy for a developmentally disabled person's legal representative to object to a community placement decision." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 442; see *Michael K.*, *supra*, 185 Cal.App.4th at pp. 1125-1126; *Whitley*, *supra*, 155 Cal.App.4th at pp. 1462-1464.) In *Michael K.* and *Whitley*, the Courts of Appeal held a dispute over whether a developmentally disabled person should remain in a state developmental center or be transferred to a community-based placement must be resolved through the Lanterman Act's fair hearing process, and judicial review may be sought only after exhausting that exclusive administrative remedy. (*Michael K.*, at pp. 1116-1117, 1125-1126; *Whitley*, at pp. 1455-1457, 1462-1464.) As the *Whitley* court explained, this conclusion is compelled by the comprehensive nature of the administrative procedures the Lanterman Act establishes, the Legislature "expressly making [the] fair hearing [process] the exclusive remedy for issues relating to the provision of services" under the Lanterman Act, and the common law exhaustion of administrative remedies doctrine, which makes "'exhaustion of the administrative remedy . . . a jurisdictional prerequisite to resort to the courts.'" (*Whitley*, at p. 1463.)

17

In deciding *Michelle K.*, we took care to distinguish between the nature and purpose of a periodic *Hop* review, and the nature and purpose of the administrative fair hearing process: "*Hop* requires periodic independent reviews to ensure a section 4825 developmental center placement does not violate a developmentally disabled person's constitutional rights. The reviews ensure the person's disabilities continue to warrant placement in the most restrictive environment available under the Lanterman Act. In contrast, the fair hearing procedures provide an administrative process for a developmentally disabled person or her representative to challenge a regional center's or developmental center's decision to change the person's placement or other services. Through the process, a mediator or hearing officer with subject matter expertise resolves specific challenges to a decision changing the services the developmentally disabled person receives." (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 443.) *Michelle K.* therefore did not require the trial court to conduct a periodic *Hop* review after the Harbor Regional Center withdrew its support for Michelle's ongoing Fairview placement. Instead, under *Michelle K.* George may invoke the fair hearing process once the Harbor Regional Center identifies a specific facility as Michelle's new placement.

George also contends *Michelle K.* required the trial court to review Michelle's Fairview placement because it has been more than five years since Michelle's placement has been judicially reviewed because of the delays in resolving earlier disputes. The periodic judicial review mandated by *Michelle K.*, however, is forward looking, asking whether Michelle's disabilities continue to justify her ongoing placement at Fairview. The Harbor Regional Center already has answered that question by withdrawing its *Hop* petition and asserting Michelle's disabilities do not warrant her continued placement at Fairview. A periodic *Hop* review therefore is not necessary to make that determination, and, as explained above, the dispute between George and the Harbor Regional Center about the appropriate placement for Michelle must be resolved through the Lanterman Act's fair hearing process.

18

Moreover, Michelle's constitutional rights are not violated by the delays inherent in the process of identifying and moving her to the least restrictive facility capable of meeting her needs. As we recognized in *Michelle K.*, Michelle "should not be transferred until all issues regarding her new placement are resolved [because] . . . '"[her] precipitous release . . . to [her] famil[y or] a[] community facilit[y] unprepared to care for [her] could be both disruptive to [her] treatment program and potentially harmful to [Michelle] and the community."'" (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 444.) The Welfare and Institutions Code also prohibits Michelle's transfer to a new facility until all necessary services and supports are in place. (§ 4418.3, subd. (a).) If the delays inherent in finding a new placement for Michelle and transitioning her to it become excessive or unreasonable, then George, or the Public Defender if it can make the showing we described in *Michelle K.* (*Michelle K.*, *supra*, 221 Cal.App.4th at pp. 431-432), may petition on Michelle's behalf for habeas corpus relief to compel judicial review of the efforts to move Michelle to a new facility.[7]

The record does not reveal whether the Harbor Regional Center has identified a specific community-based facility that it contends is capable of meeting Michelle's needs. The 2012 amendments to the Welfare and Institutions Code required the Harbor Regional Center to conduct a comprehensive assessment of Michelle's needs and identify the types of community-based services and supports that are capable of meeting those needs. (§ 4418.25, subd. (c)(2)(A) & (B).) The Harbor Regional Center was required to complete that assessment by the end of 2015, and then to share it with Michelle's individual program planning team to assist it in determining the least

---

[7] There is no need for the Harbor Regional Center to seek habeas corpus relief on Michelle's behalf because it can overcome any delays injected into the process by George or anyone else by determining Michelle should be transitioned to a particular facility and thereby compelling George to invoke the fair hearing process to challenge that determination.

19

restrictive placement available for her. (§ 4418.25, subd. (c)(2)(C) & (D).) We presume the Harbor Regional Center has performed its statutory duties, and if it has not, George, or potentially the Public Defender may bring an action to compel the Harbor Regional Center to do so. A periodic *Hop* review, however, may not be used for that purpose.

Finally, George contends the trial court should have proceeded with the periodic *Hop* review because *Michelle K.* recognized George's due process right to have a jury determine whether Michelle should remain at Fairview regardless of the Harbor Regional Center's position. Not so. *Michelle K.* addressed Michelle's constitutional rights as a developmentally disabled person confined in a state developmental center under the Lanterman Act. Although George may exercise some of Michelle's rights as her conservator, the rights belong exclusively to Michelle. (*Capitol People*, *supra*, 155 Cal.App.4th at p. 699 ["under the Lanterman Act it is the individual with a developmental disability—not his or her family, friends, or conservator—who is afforded all the legal rights and responsibilities guaranteed by the United States and California Constitutions"].) Nothing we said in *Michelle K.* recognized any right in George to have a jury determine Michelle's proper placement. Any conclusion to the contrary would allow George to circumvent the Lanterman Act's fair hearing process as the exclusive means for resolving disputes about the proper services and placement for a developmentally disabled person.

C.      *The Trial Court Did Not Error In Dismissing the Harbor Regional Center's* Hop
        *Petition*

George also contends the trial court erred in granting the Harbor Regional Center's request to dismiss the *Hop* petition and related proceedings because George filed a notice of joinder in the petition that prevented the Harbor Regional Center from dismissing it. We disagree.

George does not dispute that Code of Civil Procedure section 581, subdivision (b), grants a plaintiff or petitioner the right to dismiss its pleading at any time

20

before trial, nor does George dispute that section applies to the Harbor Regional Center's *Hop* petition. Instead, George contends case law recognizes an exception to a plaintiff's or petitioner's right to dismiss an action when "the plaintiff or petitioner is not the sole party in interest on plaintiff's side and, though the plaintiff has instituted the proceeding, is not entitled to terminate it." (See 6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 292, p. 744.) According to George, he and Michelle, as parties in interest, may require the trial court to decide the *Hop* petition and determine whether Michelle's disabilities continue to justify her Fairview placement. We do not find this contention persuasive because it relies on a fundamental misunderstanding concerning the nature of a periodic *Hop* review and the issues arising once the Harbor Regional Center withdrew its support for Michelle's continued placement at Fairview.

As explained above, the sole purpose of a periodic *Hop* review is to determine whether a developmentally disabled person's disabilities continue to justify the restraints on the person's fundamental liberty interests that are inherent in a section 4825 placement in a state developmental center. Here, the need for that review ended when the Harbor Regional Center withdrew its support for Michelle's continued placement at Fairview and sought to dismiss the *Hop* petition. The disagreement between George and the Harbor Regional Center over whether Michelle should be transferred to a community-based facility or remain at Fairview is a dispute over what specific services Michelle is entitled to receive, and must be resolved through the Lanterman Act's fair hearing process. Judicial review may be sought only after that administrative remedy has been exhausted. After the Harbor Regional Center withdrew its support for Michelle's continued Fairview placement, there was nothing for the trial court to decide on the *Hop* petition and neither George nor Michelle had any interest in the petition that prevented the Harbor Regional Center from dismissing it.

George's joinder in the *Hop* petition before the Harbor Regional Center sought to dismiss the petition did not prevent the trial court from dismissing the petition.

21

Without the Harbor Regional Center's support for Michelle's ongoing placement at Fairview, there is nothing in which George may join because, as explained above, Michelle cannot remain at Fairview without the Harbor Regional Center's approval.

Furthermore, George's joinder was improper and ineffectual. Parties voluntarily may join together in filing an action or seeking relief from the court in their own name. (Code Civ. Proc., § 378.) Similarly, if a person already is a party to an action or proceeding, the person may file a cross-complaint or cross-petition seeking affirmative relief in the person's own name (Code Civ. Proc., § 428.10), and if a person is not a party to an action or proceeding, the person make seek leave of court to intervene and request relief in the person's own name (Code Civ. Proc., § 387).

A party also may join in the legal or factual arguments another party makes in a motion or other request for relief, but that "joinder" does not entitle the joining party to any relief. (*Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382, 1390-1391, superseded by statute on another issue as stated in *Chitsazzadeh v. Kramer & Kaslow* (2011) 199 Cal.App.4th 676, 685, fn. 7; *Village Nurseries v. Greenbaum* (2002) 101 Cal.App.4th 26, 46-47.) For example, *Decker* involved a notice of joinder that, like George's, simply stated one party joined in another party's motion without requesting any relief in the name of the joining party. (*Decker*, at p. 1386.) We explained the joining party lacked standing to appeal the trial court's ruling on the underlying motion and was not bound by that ruling because the joining party had not made a proper motion or requested relief in its own name. (*Id.* at p. 1391; compare *Barak v. The Quisenberry Law Firm* (2006) 135 Cal.App.4th 654, 660-661 [party's joinder in another party's motion entitled joining party to relief because joinder expressly requested relief in name of joining party and explained why arguments made in other party's motion entitled joining party to relief].)

George cites no authority that allows one party to unilaterally join in another party's pleading or request for relief and thereby prevent that party from

22

dismissing its pleading or request.  Accordingly, we conclude George's notice of joinder did not prevent the trial court from dismissing the Harbor Regional Center's *Hop* petition.[8]

III

DISPOSITION

The order is affirmed.  In the interest of justice, all parties shall bear their own costs on appeal.

ARONSON, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

FYBEL, J.

---

[8]     George also contends the trial court's dismissal of the *Hop* petition violated the writ of mandate we issued in *Michelle K.*  Not so.  We merely instructed the trial court to conduct a hearing on the Harbor Regional Center's *Hop* petition.  (*Michelle K.*, *supra*, 221 Cal.App.4th at p. 452.)  We did not instruct the trial court to review Michelle's placement in the face of the Harbor Regional Center's conclusion the placement no longer was appropriate.